## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Rozita Arnold, Patsy Banks, Adrienne Baugh, Phoebe Beamon, Alicia Benavides, Setian Bey, Rochelle Blocker, Glori Bond, Kari Boykin, Eddie Bradley, Jennifer Branigan, Louis Brooks, Isheona Brown, Shirley Brown, Stephanie Brown, Dolores Buckley, Leroy Burton, Victor Burton, Joyce Calvin-Harmon, Endella Cole, Jacqueline Coleman, Vivian Covington, Lonzell Cross, Christopher Cruz, Leneka Davis, Lorenzo Davis, Ronald Davis, Shavon Davis, Latasha Downing, Diane Doyle, Erica Duncan, Sharon Elliott, Tommie Galloway, Otis Gardner, Todd Gardner, Christopher Graham, Leshem Graham, Elaine Green, Roosevelt Hall, Robert Hawkins, Lydia Henry, Dorothy Hickman, Roger Hickman, Eric Hirsch Jr., Anthony Hudson, Louvon Zelor Humphries, James Jackson, Veta Jackson, Shirley Jackson-Gordon, Zakia Jarrett, Andre Johnson, Charlene Johnson, Crystal Johnson, Dwayne Johnson, Clarence Jones, Irene Jones, Marjorie Jones, Darlissa Jordan, Joseph Lewis, Jennifer Madden, Wilton Martin, Sade McFadden, Yvette Mells, Michael Merrill, Cara Meyers, Deidre Meyers, Carmelita Moore, Mike Ogbara, Deborah Orr, Porchia Pelt, Lolita Perkins, Lisa Plummerel, Henry Porter, Kelly Rembert, Shirley Rivers, Natasha Roberson, James Roberson, Phyllis Saunders, Peggy Sims, Michelle Smith-Williams, George Snyder, Jimmy Sorrell, Hester Spurlock, Laquesha Stephenson, Sylvia Stevens, LaTanya Stewart, John Turner, Tanika Vercher, Robin Walker, Phyllis Warren, Ernestine Watson, Mary White, Cleo Wilder, Gina Williams, Johnny Williams, Marquita Willis, Gregory Wooding, and Sharon Wynn, individually, and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:25-cv-2522 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| AQUA ILLINOIS, INC., an Illinois corporation, | ) ) ) | **Jury Trial Demanded** |
| Defendant. | ) ) | |

# CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................................2

II.    PARTIES .....................................................................................................................3

    A.    Plaintiffs ..........................................................................................................3

    B.    Defendant ........................................................................................................4

III.   JUISDICTION AND VENUE....................................................................................4

IV.  FACTUAL ALLEGATIONS ....................................................................................4

    A.    Aqua Switched the University Park Water Supply to Kankakee River Water in December 2017 ..............................................................................4

    B.    Aqua Was in a Rush to Get the Kankakee River Water Main Into Service ...........5

        1.    Aqua Wanted to Get the Water Main in Service by the End of 2017, So Aqua Could Increase its Water Rates to University Park Customers .........5

        2.    Aqua Put the Water Main in Service Without an Operating Permit, in Violation of the Law ...............................................................................5

        3.    Aqua Has a Pattern and Practice of Putting Water Mains in Service Without an Operating Permit ....................................................................5

    C.    Aqua Started Adding the SeaQuest Chemical to University Park Water ...............6

        1.    Aqua Started Adding SeaQuest to University Park Well Water in July 2017.....................................................................................................6

        2.    The Purpose of Using SeaQuest Was to Dissolve Scale From the Surface of Water Pipes, and Prevent New Scale from Forming.................6

        3.    Aqua Continued Adding SeaQuest in University Park After the Switch to Kankakee River Water...............................................................6

        4.    Aqua Started Adding SeaQuest to the Kankakee River Water Without a Construction Permit or an Operating Permit, in Violation of the Law ........6

        5.    Aqua Has a Pattern and Practice of Adding Chemicals to Public Water Supplies Without an Operating Permit .............................................7

    D.    Aqua Failed to Perform Any Corrosion Control Studies, Coupon Studies, or Increased Water Testing Prior to the Switch to Kankakee River Water.................7

1.      Aqua Failed to Perform Any Studies or Testing to Determine What the Initial Dosage of SeaQuest Should Be .................................................7

2.      The Vernon Snoeyink Report Was the Only Evaluation Performed Prior to the Switch to Kankakee River Water ................................................7

3.      Aqua Ignored All of the Warnings Raised in the Snoeyink Report Concerning SeaQuest and the Switch to Kankakee River Water ..............8

E.      Aqua Violated Its Water Switch Protocol Requiring Aqua to Verify That SeaQuest Was Being Fed at the Correct Dosage ....................................................10

1.      Aqua Has No Records Showing How Much SeaQuest It Was Adding to the University Park Public Water Supply .................................................10

2.      Aqua Was Adding SeaQuest at a Rate Higher Than the Recommended Dosage, in Violation of its Water Switch Protocol ...................................10

F.      Aqua Failed to Perform Lead Testing One Month After the Water Switch, In Violation of Aqua's Water Switch Protocol .......................................................11

G.      The First Round of Lead Testing in 2018 Showed Elevated Lead, but Aqua Manipulated the Results and Did Not Provide the Mandatory Notification to University Park Customers .......................................................................................11

1.      University Park Never Had a Problem With Lead in the Water Prior to the Switch to Kankakee River Water ...........................................................11

2.      The First Time Lead Testing Was Performed After the Water Switch, the Results Showed Elevated Lead in the Water for the First Time in the History of University Park .................................................................11

3.      Aqua Manipulated the Lead Test Results, and Failed to Provide the Required Notice to University Park Customers .........................................12

4.      The IEPA Issued Two Violation Notices to Aqua Due to Aqua's Improper August 2018 Lead Sampling ......................................................12

5.      Aqua Could Not Assure the University Park Tap Water Was Safe to Consume in 2018, Yet Aqua Did No Testing or Investigation Into the Elevated Lead .............................................................................................12

H.      The Village of Peotone Coupon Study in January 2019 Showed SeaQuest Should Not Be Used in University Park, but Aqua Ignored the Expert's Warnings ........................................................................................................13

I.    The Second Round of Lead Testing in 2019 Showed Elevated Lead, and Aqua Issued a Do Not Consume Notice Because Aqua Could Not Assure The Water Was Safe to Consume ........................................................................14

    1.    The Second Time Lead Sampling Was Performed After the Water Switch, the Results Again Showed Elevated Lead in University Park Water ...............................................................................................14

    2.    Aqua Issued a Do Not Consume Notice Advising All University Park Customers Not to Consume Their Tap Water Because Aqua Could Not Assure the Water Was Safe to Consume.................................15

    3.    Aqua Could Not Assure the University Park Tap Water Was Safe to Consume in 2019, Yet Aqua Did No Corrosion Control Study to Investigate the Elevated Lead .................................................................16

J.    Aqua Stopped the SeaQuest on June 15, 2019 Because the SeaQuest Removed the Scale on the Water Pipes, and Aqua Started Adding Orthophosphate to Put the Protective Scale Back on the Pipes............................................................16

    1.    Aqua Discontinued the Use of SeaQuest on June 15, 2019......................16

    2.    The SeaQuest Combined with the Kankakee River Water Removed the CaCO3 Scale and Caused the Elevated Lead in the Tap Water...........16

    3.    Aqua Should Not Have Used SeaQuest With the Kankakee River Water in University Park ..........................................................................18

    4.    Aqua Started Adding Orthophosphate to University Park Water to Put the Scale Back on the Water Pipes ...................................................18

K.    Aqua Replaced the Do Not Consume With a Lead Advisory Area Because Aqua Could Not Assure the Tap Water Was Safe to Consume in the Homes in the Lead Advisory Area.........................................................................................18

    1.    Aqua Replaced the Do Not Consume With a Lead Advisory Area on July 29, 2019........................................................................................18

    2.    Aqua Could Not Assure the Tap Water Was Safe to Consume in the Homes in the Lead Advisory Area.......................................................19

L.    Aqua Violated an EPA Regulation in a Secret Effort to Try to Artificially Lower the Lead Levels in Compliance Tests in 2020...........................................20

M.    Aqua Acted Willfully, or With Such Gross Negligence as to Indicate a Wanton Disregard of the Rights of Others, as Aqua Inflicted a Highly Unreasonable Risk of Harm Upon Its Customers in Conscious Disregard of the Risk...............21

1.      There is No Known Level of Lead in Drinking Water That is Safe to Consume ..............................................................21

2.      The Drinking Water Throughout University Park Was Contaminated With High Levels of Lead.........................................................21

3.      Aqua Could Not Assure the Tap Water Safe to Consume for All Residents Throughout University Park ......................................22

4.      Lead Can Cause Serious Health Problems if it is Ingested From Drinking Lead-Contaminated Water...............................................22

5.      The Elevated Lead Throughout University Park Water Caused Extensive Harm to All Residents, Regardless of Whether They Had Elevated Lead in Their Tap Water ......................................23

N.      Having Knowledge of the Impending Danger of the Release of Lead Into University Park Water, Aqua Failed to Exercise Ordinary Care to Prevent the Danger ...........................................................................................26

O.      Aqua Has a Pattern and Practice of Engaging in Misconduct and Violating the Law ...................................................................................30

P.      Punitive Damages Should Be Awarded Against Aqua.........................................30

V.      APPLICABLE STATUTORY AND REGULATORY FRAMEWORK.........................31

A.      The Illinois Environmental Protection Act .........................................................31

1.      Aqua Caused or Threatened or Allowed the Discharge of SeaQuest Into the Drinking Water Supply Throughout the Village Caused or Tended to Cause Water Pollution in The Village ....................................32

2.      Aqua Caused or Threatened or Allowed the Discharge of Lead Into the Drinking Water Supply Throughout the Village Caused or Tended to Cause Water Pollution in the Village.......................................34

3.      Aqua Knowingly Caused, Threatened, or Allowed the Distribution of Water From the Public Water Supply to Have a Quality That Was Injurious to Human Health...........................................................35

4.      Aqua Failed to Provide Water That Was Assuredly Safe..........................35

B.      CERCLA...............................................................................................................36

VI.     CLASS ALLEGATIONS .................................................................................................39

A.      Rule 23 Allegations.............................................................................................39

B.  Classwide Damages and Relief.................................................................53

VII.  CAUSES OF ACTION ...................................................................................54

COUNT I (CERCLA Cost Recovery) ...................................................54

COUNT II (Nuisance)............................................................................55

COUNT III (Negligence)........................................................................57

COUNT IV (Trespass)............................................................................59

VIII.  PRAYER OF RELIEF ...................................................................................60

IX.  JURY DEMAND .............................................................................................61

Plaintiffs Rozita Arnold, Patsy Banks, Adrienne Baugh, Phoebe Beamon, Alicia Benavides, Setian Bey, Rochelle Blocker, Glori Bond, Kari Boykin, Eddie Bradley, Jennifer Branigan, Louis Brooks, Isheona Brown, Shirley Brown, Stephanie Brown, Dolores Buckley, Leroy Burton, Victor Burton, Joyce Calvin-Harmon, Endella Cole, Jacqueline Coleman, Vivian Covington, Lonzell Cross, Christopher Cruz, Leneka Davis, Lorenzo Davis, Ronald Davis, Shavon Davis, Latasha Downing, Diane Doyle, Erica Duncan, Sharon Elliott, Tommie Galloway, Otis Gardner, Todd Gardner, Christopher Graham, Leshem Graham, Elaine Green, Roosevelt Hall, Robert Hawkins, Lydia Henry, Dorothy Hickman, Roger Hickman, Eric Hirsch Jr., Anthony Hudson, Louvon Zelor Humphries, James Jackson, Veta Jackson, Shirley Jackson-Gordon, Zakia Jarrett, Andre Johnson, Charlene Johnson, Crystal Johnson, Dwayne Johnson, Clarence Jones, Irene Jones, Marjorie Jones, Darlissa Jordan, Joseph Lewis, Jennifer Madden, Wilton Martin, Sade McFadden, Yvette Mells, Michael Merrill, Cara Meyers, Deidre Meyers, Carmelita Moore, Mike Ogbara, Deborah Orr, Porchia Pelt, Lolita Perkins, Lisa Plummerel, Henry Porter, Kelly Rembert, Shirley Rivers, Natasha Roberson, James Roberson, Phyllis Saunders, Peggy Sims, Michelle Smith-Williams, George Snyder, Jimmy Sorrell, Hester Spurlock, Laquesha Stephenson, Sylvia Stevens, LaTanya Stewart, John Turner, Tanika Vercher, Robin Walker, Phyllis Warren, Ernestine Watson, Mary White, Cleo Wilder, Gina Williams, Johnny Williams, Marquita Willis, Gregory Wooding, and Sharon Wynn (collectively, "Plaintiffs"), individually, and on behalf of all others similarly situated, by and through counsel at Zimmerman Law Offices, P.C., bring this complaint against Defendant Aqua Illinois, Inc. ("Defendant" or "Aqua"), as follows:

## I.      INTRODUCTION

1.      This Class Action Complaint arises out of the contamination of the water supply of Plaintiffs and thousands of other residents and entities in the Village of University Park,

Illinois (the "Village") by Aqua, which owns and operates the public water system in the Village (the "Public Water System"). The water supplied by the Public Water System shall be hereinafter referred to as the "Public Water Supply."

2.      As set forth below, Aqua caused and/or threatened the release of a contaminant—*i.e.*, SeaQuest and/or lead—into the drinking water supply throughout the Village by altering the properties of the Public Water Supply. The release and/or threatened release of SeaQuest and/or lead into Plaintiffs' and Class members' drinking water caused them to incur significant costs and other damages for which they seek redress in this action.

## II.     PARTIES

### A.     Plaintiffs

3.      At all relevant times, Plaintiffs Rozita Arnold, Patsy Banks, Adrienne Baugh, Phoebe Beamon, Alicia Benavides, Setian Bey, Rochelle Blocker, Glori Bond, Kari Boykin, Eddie Bradley, Jennifer Branigan, Louis Brooks, Isheona Brown, Shirley Brown, Stephanie Brown, Dolores Buckley, Leroy Burton, Victor Burton, Joyce Calvin-Harmon, Endella Cole, Jacqueline Coleman, Vivian Covington, Lonzell Cross, Christopher Cruz, Leneka Davis, Lorenzo Davis, Ronald Davis, Shavon Davis, Latasha Downing, Diane Doyle, Erica Duncan, Sharon Elliott, Tommie Galloway, Otis Gardner, Todd Gardner, Christopher Graham, Leshem Graham, Elaine Green, Roosevelt Hall, Robert Hawkins, Lydia Henry, Dorothy Hickman, Roger Hickman, Eric Hirsch Jr., Anthony Hudson, Louvon Zelor Humphries, James Jackson, Veta Jackson, Shirley Jackson-Gordon, Zakia Jarrett, Andre Johnson, Charlene Johnson, Crystal Johnson, Dwayne Johnson, Clarence Jones, Irene Jones, Marjorie Jones, Darlissa Jordan, Joseph Lewis, Jennifer Madden, Wilton Martin, Sade McFadden, Yvette Mells, Michael Merrill, Cara Meyers, Deidre Meyers, Carmelita Moore, Mike Ogbara, Deborah Orr, Porchia Pelt, Lolita Perkins, Lisa Plummerel, Henry Porter, Kelly Rembert, Shirley Rivers, Natasha Roberson, James

3

Roberson, Phyllis Saunders, Peggy Sims, Michelle Smith-Williams, George Snyder, Jimmy Sorrell, Hester Spurlock, Laquesha Stephenson, Sylvia Stevens, LaTanya Stewart, John Turner, Tanika Vercher, Robin Walker, Phyllis Warren, Ernestine Watson, Mary White, Cleo Wilder, Gina Williams, Johnny Williams, Marquita Willis, Gregory Wooding, and Sharon Wynn were residents of the Village of University Park, Illinois.

**B.** **Defendant**

4.      Defendant Aqua Illinois, Inc. is an Illinois corporation with its principal place of business located at 1000 S. Schuyler Avenue, Kankakee, Illinois 60901.

**III.     JURISDICTION AND VENUE**

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 103, *et seq.*, which is a federal statute.

6.      Supplemental jurisdiction to adjudicate issues pertaining to state law is proper in this Court pursuant to 28 U.S.C. § 1367, because the state law claims are related to the CERCLA claim.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because Defendant resides in this District and a substantial part of the events or omissions giving rise to Plaintiffs' and Class members' claims occurred in, was directed to, and/or emanated from this District.

**IV.     FACTUAL ALLEGATIONS**

**A.     Aqua Switched the University Park Public Water Supply to Kankakee River Water in December 2017**

8.       Aqua switched the University Park Public Water Supply from groundwater wells to the Kankakee River water on December 9, 2017.

4

**B.      Aqua Was in a Rush to Get the Kankakee River Water Main Into Service**

     **1.      Aqua Wanted to Get the Water Main in Service by the End of 2017, So Aqua Could Increase its Water Rates to University Park Customers**

9.      Aqua's priority was to get the Kankakee River water main into service and start delivering Kankakee River water to University Park by the end of 2017, so Aqua could get increased water rates from University Park customers approved by the Illinois Commerce Commission ("ICC") as part of its pending rate case before the ICC.

10.      Aqua's president, Craig Blanchette ("Blanchette"), told Keith Mulholland ("Mulholland")—who was in charge of getting the water main in service for Aqua—that Mulholland should devote 12-hour shifts and round-the-clock crews to this water main project, and that it was Mulholland's #1 priority to make sure it gets into service by the end of 2017, so Aqua could increase its water charges to University Park customers as part of its pending ICC rate case.

     **2.      Aqua Put the Water Main in Service Without an Operating Permit, in Violation of the Law**

11.      Because Aqua was in a rush to get the Kankakee River water main in service, Aqua put the water transmission main to University Park in service without an operating permit. Blanchette knew the water main would be put in service without an operating permit, and he allowed that to happen.

12.      The Illinois EPA ("IEPA") issued a Violation Notice to Aqua for this misconduct.

     **3.      Aqua Has a Pattern and Practice of Putting Water Mains in Service Without an Operating Permit**

13.      It was a regular practice for Aqua to put water pipelines into service without an operating permit.

5

C. **Aqua Started Adding the SeaQuest Chemical to University Park Water**

1. **Aqua Started Adding SeaQuest to University Park Well Water in July 2017**

14.     SeaQuest was first added to the water in University Park wells on July 13, 2017.

15.     Aqua selected SeaQuest based on past performance because Aqua used SeaQuest elsewhere in the past.

2. **The Purpose of Using SeaQuest Was to Dissolve Scale From the Inner Surface of Water Pipes, and Prevent New Scale From Forming**

16.     The purpose of using SeaQuest was to remove/dissolve the calcium carbonate (CaCO3) scale from the inner surface of the water pipes throughout University Park, and also help prevent new CaCO3 deposits from forming on the pipes.

3. **Aqua Continued Adding SeaQuest in University Park After the Switch to Kankakee River Water**

17.     When Aqua switched University Park from well water to Kankakee River water in December 2017, Aqua started feeding SeaQuest into the Kankakee River water in University Park, and Aqua continuously added SeaQuest to the Kankakee River water in University Park thereafter.

4. **Aqua Started Adding SeaQuest to the Kankakee River Water Without a Construction Permit or an Operating Permit, in Violation of the Law**

18.     Aqua started adding SeaQuest to the Kankakee River water in University Park in December 2017 without a *construction* permit for the chemical feed equipment to do that. The IEPA issued a Violation Notice to Aqua for this misconduct.

19.     Aqua started adding SeaQuest to the Kankakee River water in University Park in December 2017 without an *operating* permit for the chemical feed equipment to do that. The IEPA issued a Violation Notice to Aqua for this misconduct.

20.    Blanchette and other Aqua employees knew Aqua was adding SeaQuest to University Park water without a permit, and they allowed that to happen because they were in a rush to get the water main in service.

> **5.    Aqua Has a Pattern and Practice of Adding Chemicals to Public Water Supplies Without an Operating Permit**

21.    It was a regular practice for Aqua to add chemicals to municipal public water supplies without an operating permit.

> **D.    Aqua Failed to Perform Any Corrosion Control Studies, Coupon Studies, or Increased Water Testing Prior to the Switch to Kankakee River Water**

> **1.    Aqua Failed to Perform Any Studies or Testing to Determine What the Initial Dosage of SeaQuest Should Be**

22.    Aqua determined the initial dosage of SeaQuest to add to the Kankakee River water in University Park based on previous experience using SeaQuest elsewhere in the past.

23.    Aqua failed to perform any studies or testing to determine what the initial SeaQuest dosage should be in University Park.

> **2.    The Vernon Snoeyink Report Was the Only Evaluation Performed Prior to the Switch to Kankakee River Water**

24.    Prior to the switch to Kankakee River water in December 2017, Aqua failed to perform any coupon studies or increased water studies relative to Kankakee River water and SeaQuest.

25.    After Aqua started adding SeaQuest to the University Park wells in July 2017 up to the time of the switch to Kankakee River water in December 2017, Aqua failed to perform any additional testing of the water at the Kankakee Water Treatment Plant or in University Park.

26.    The Vernon Snoeyink ("Snoeyink") report, dated August 1, 2017 ("Snoeyink Report"), was the only evaluation performed relative to Kankakee River water and SeaQuest as it relates to corrosion control within the water pipes, brass plumbing, and water fixtures in

7

University Park.

### 3. Aqua Ignored All of the Warnings Raised in the Snoeyink Report Concerning SeaQuest and the Switch to Kankakee River Water

27.     Aqua knew that the University Park well water was highly supersaturated with $CaCO_3$, and the well water had a high potential to deposit $CaCO_3$ on the pipes. Snoeyink calculated that the inner surfaces of University Park water pipes should be covered with a thick calcium carbonate ($CaCO_3$) coating, but Aqua personnel said the water system did not show such a scale.  However, Aqua failed to perform any corrosion control studies or any other studies to try to explain this discrepancy prior to the water switch.

28.     The Snoeyink Report warned that adding SeaQuest to the Kankakee River water in University Park will likely cause the water to be undersaturated with $CaCO_3$, which may lead to dissolution of $CaCO_3$-containing scales from the water pipes, and that SeaQuest dosage control will be especially important relative to controlling this effect. However, when Aqua was considering whether to use SeaQuest and how much SeaQuest to use, Aqua failed to consider whether adding SeaQuest to the Kankakee River water would cause the water to be undersaturated with $CaCO_3$, or whether that may lead to the dissolution of $CaCO_3$-containing scales from the University Park water pipes.

29.     The Snoeyink Report warned that it is likely that the SeaQuest will sequester some of the calcium and cause the water to be undersaturated with $CaCO_3$, and the undersaturation can lead to the dissolution of $CaCO_3$ deposits on the University Park water pipes. However, Aqua failed to take this potentiality of the dissolution of $CaCO_3$ scales from the University Park water pipes into consideration when deciding whether to use SeaQuest and how much SeaQuest to use.

30.     Prior to the switch, Aqua knew of the differences in water chemistry between University Park well water and Kankakee River water (*e.g.*, University Park well water is very

8

hard, Kankakee River water is soft, University Park well water has high alkalinity, Kankakee River water has low alkalinity). Aqua knew this prior to the water switch.

31.     The Snoeyink Report warned that the Kankakee River water is much softer, lower in alkalinity, and significantly less supersaturated with CaCO3 than the current University Park well water supply, and thus, release of CaCO3 deposits from water pipes might occur when the change to Kankakee River water takes place, and SeaQuest may increase the magnitude of such release because one of its actions is to remove CaCO3 deposits from water distribution piping. However, when deciding whether to use SeaQuest and how much SeaQuest to use, Aqua failed to consider whether SeaQuest may increase the magnitude of the release of CaCO3 deposits from the University Park water piping system after the switch to Kankakee River water.

32.     The Snoeyink Report warned that the likely sources of lead in the University Park water piping system are lead/tin solder and brass faucets. The Snoeyink Report warned that lead values in University Park tap water may increase if CaCO3 deposits covering lead/tin solder in water pipes and brass fixture surfaces are removed. However, when Aqua was deciding whether to use SeaQuest and how much SeaQuest to use, Aqua failed to consider whether University Park tap water lead values may increase if CaCO3 deposits covering lead/tin solder and brass fixture surfaces are removed.

33.     The Snoeyink Report warned that lead/tin solder in water pipes and brass fixtures can cause high lead values in the water, so care must be taken to avoid water quality changes that cause removal of CaCO3 scales from these materials, and thus allow more lead to be released into the University Park tap water. However, there was no consideration taken by Aqua to avoid water quality changes (after the switch to Kankakee River water) that may cause the removal of CaCO3 scales and allow lead to be released into the University Park drinking water.

9

**E. Aqua Violated Its Water Switch Protocol Requiring Aqua to Verify That SeaQuest Was Being Fed at the Correct Dosage**

**1. Aqua Has No Records Showing How Much SeaQuest It Was Adding to the University Park Public Water Supply**

34. Aqua was filling out Monthly Operating Reports ("MOR") listing the chemicals, and their dosages, that Aqua was adding to the University Park public water system *prior* to the switch to Kankakee River water.

35. However, Aqua stopped filling out MORs for the University Park public water system *after* the switch to Kankakee River water.

36. Aqua has no document or information showing the actual amount of SeaQuest that Aqua was adding into the University Park Public Water Supply after the switch to Kankakee River water.

**2. Aqua Was Adding SeaQuest at a Rate Higher Than the Recommended Dosage, in Violation of its Water Switch Protocol**

37. Aqua's water switch protocol required Aqua to verify that SeaQuest was being fed into the University Park water system at the correct dosage. However, there is no information or documents showing Aqua was actually verifying that SeaQuest was being fed into the University Park water system at the correct dosage.

38. Because Aqua has no records showing the actual amount of SeaQuest that it was adding to the University Park public water system after the switch to Kankakee River water, Aqua calculated the estimated SeaQuest dosing based on (i) the invoices showing how much SeaQuest was purchased, and (ii) the amount of water going from the Central Avenue Booster Station into University Park.

39. Aqua's calculations estimate that from December 2017 (the switch to Kankakee River water) to June 2019 (the Do Not Consume), Aqua was adding *5 times more* SeaQuest to the University Park public water system than it was supposed to add.

40.     In violation of Aqua's water switch protocol, Aqua was adding SeaQuest into the University Park water system at a dosage *higher* than the recommended target rate. After the Do Not Consume was issued, it became common knowledge that Aqua had been dosing SeaQuest *higher* than the recommended rate.

**F.      Aqua Failed to Perform Lead Testing One Month After the Water Switch, in Violation of Aqua's Water Switch Protocol**

41.     Aqua's water switch protocol required Aqua to perform lead and copper testing in University Park tap water one month after switching to Kankakee River water, at a minimum of five sites.

42.     In violation of Aqua's water switch protocol, Aqua failed to perform any lead and copper testing within one month after switching the water source from groundwater wells to Kankakee River water in University Park.

**G.      The First Round of Lead Testing in 2018 Showed Elevated Lead, but Aqua Manipulated the Results and Did Not Provide the Mandatory Notification to University Park Customers**

**1.      University Park Never Had a Problem With Lead in the Water Prior to the Switch to Kankakee River Water**

43.     From 1992 through 2017 (prior to the water switch to Kankakee River water), the University Park water test results indicated no problem with lead in the water in University Park.

**2.      The First Time Lead Testing Was Performed After the Water Switch, the Results Showed Elevated Lead in the Water for the First Time in the History of University Park**

44.     The August 2018 residential tap water testing was the <u>first</u> time that lead testing was performed on the water in University Park after the source water switch to Kankakee River water in December 2017.

45.     The results of the August 2018 water testing showed that the tap water lead results had a 90th percentile that exceeded the 15 ppb EPA lead action level. This water testing showed

lead detections in homes above 15 ppb for the ***first time in the history*** of water sampling in University Park.

### 3. Aqua Manipulated the Lead Test Results, and Failed to Provide the Required Notice to University Park Customers

46.     Because the August 2018 water lead results exceeded the EPA lead action level, Chapter 4 of the Lead and Copper Rule required Aqua to provide written notice of the elevated lead to each of the University Park customers. However, in violation of this Lead and Copper Rule requirement, Aqua did not provide the required written notice of the elevated lead to the University Park customers.

47.     Instead, Aqua collected one additional water sample to "dilute" the test results and bring the 90th percentile to **0.1 ppb below** the 15 ppb EPA lead action level, and Aqua stopped testing after collecting that one sample. According to an EPA employee, Aqua's conduct in increasing the water sampling to "dilute" the testing pool and bring the overall lead test results below the EPA lead action level was not proper.

### 4. The IEPA Issued Two Violation Notices to Aqua Due to Aqua's Improper August 2018 Lead Sampling

48.     The IEPA issued a Violation Notice to Aqua relative to the August 2018 sampling for Aqua's failure to properly categorize lead and copper sampling sites according to the regulations for University Park.

49.     The IEPA issued a Second Violation Notice to Aqua relative to the August 2018 sampling because Aqua failed to collect all required samples for University Park.

### 5. Aqua Could Not Assure the University Park Tap Water Was Safe to Consume in 2018, Yet Aqua Did No Testing or Investigation Into the Elevated Lead

50.     The U.S. EPA required Aqua to admit that it could not ensure the quality of the University Park drinking water from July – December 2018, due to Aqua's sampling misconduct

in the August 2018 lead testing.

51.     After the switch to Kankakee River water in December 2017, Aqua could have tested the water in University Park for lead every month if it wanted to. Aqua did not need permission from the IEPA to conduct increased lead testing in University Park after the switch.

52.     However, Aqua performed no additional water or lead testing to investigate the cause of the elevated lead test results in the August 2018 water testing. Aqua failed to perform a corrosion control study for the University Park public water system in response to the results of the August 2018 water testing.

53.     Aqua did nothing to investigate the source of the elevated lead levels in University Park tap water following the August 2018 testing, which showed elevated lead for the first time in the history of the village.

**H.      The Village of Peotone Coupon Study in January 2019 Showed SeaQuest Should Not Be Used in University Park, but Aqua Ignored the Expert's Warnings**

54.     On January 10, 2019, David Cornwell ("Cornwell") issued his report on the coupon study he performed for Aqua to analyze the switch from well water to Kankakee River water in the Village of Peotone ("Peotone Study"). As part of the Peotone Study, Cornwell made some recommendations with respect to the dosing and use of SeaQuest in University Park, stating the results of the Peotone Study may also be useful for the University Park system which also recently switched to Kankakee Water Treatment Plant treated water.

55.     The Peotone Study showed the optimal SeaQuest dose to limit lead solubility was zero (0.00). In other words, using *no* SeaQuest performed the same as *using* SeaQuest to control the release of lead into the water. The Peotone Study also showed higher doses of SeaQuest actually resulted in higher lead levels in the water; thus, using *no* SeaQuest would actually *reduce* the release of lead into the water.

13

56. Cornwell warned that SeaQuest should not be added alone due to the observed increase of lead in the water in the Peotone Study. However, Aqua continued adding SeaQuest alone in University Park and Aqua did nothing to evaluate the rationale for continuing to use SeaQuest in University Park water, as opposed to discontinuing SeaQuest altogether.

57. Cornwell warned that if SeaQuest is needed to sequester iron or other metals, SeaQuest's effect of releasing lead in the water may be offset if an orthophosphate is added along with the SeaQuest, as the water lead levels decreased when an orthophosphate was added to SeaQuest.

58. However, Aqua did not add an orthophosphate to the SeaQuest in University Park and Aqua did nothing to evaluate the rationale for either adding an orthophosphate to the SeaQuest, or not adding an orthophosphate to the SeaQuest, in University Park water.

**I.      The Second Round of Lead Testing in 2019 Showed Elevated Lead, and Aqua Issued a Do Not Consume Notice Because Aqua Could Not Assure the Water Was Safe to Consume**

**1.      The Second Time Lead Sampling Was Performed After the Water Switch, the Results Again Showed Elevated Lead in University Park Water**

59. The May 2019 residential tap water testing was the second round of lead testing conducted in University Park after the source water switch to Kankakee River water in December 2017.

60. Similar to the August 2018 sampling, the levels of lead in the May 2019 water testing also exceeded the EPA lead action level because more than 10% of the tap water samples had a lead concentration greater than 15 ppb (*i.e.*, the results exceeded the 90th percentile for lead). In fact, Lead and Copper Rule sampling showed the 90th percentile for lead was significantly elevated at 167 ppb in University Park water.

14

**2.    Aqua Issued a Do Not Consume Notice Advising All University Park Customers Not to Consume Their Tap Water Because Aqua Could Not Assure the Water Was Safe to Consume**

61.    On June 14, 2019, Aqua issued a Do Not Consume notice for all customers in the entire University Park service area. There were a total of 2,124 unique premises in the Do Not Consume from June 14, 2019 to July 29, 2019 (when the Lead Advisory Area was created). Of the 2,124 premises in the Do Not Consume, **1,902** of them were **residences**.

62.    Aqua issued the Do Not Consume so that nobody in University Park would consume the tap water. At that time, Aqua did not know what was causing the elevated lead levels or how widespread it was throughout University Park.

63.    At the time Aqua issued the Do Not Consume notice, Aqua could not assure that the finished water coming out of every University Park consumer's tap was safe to consume.

64.    Because Aqua could not assure that the finished water coming out of every University Park consumer's tap was safe to consume, University Park consumers subject to the Do Not Consume suffered the following damages:

(a)    Expending out-of-pocket costs for bottled water, filters for water pitchers, filtration systems, medical bills, temporary lodging, and other expenses;

(b)    Loss of time;

(c)    Loss of income;

(d)    The presence and potential for elevated levels of lead in the drinking water supply throughout the Village has threatened the health of Plaintiffs and Class members, and exposes them to injury and the fear of future injury, including the risk of increased and irreversible health impacts, especially to young children; and

(e)    The lives of Plaintiffs and Class members have been disrupted on a daily basis, causing considerable stress, aggravation, annoyance, inconvenience, and discomfort.

      **3.**     **Aqua Could Not Assure the University Park Tap Water Was Safe to Consume in 2019, Yet Aqua Did No Corrosion Control Study to Investigate the Elevated Lead**

65.     The IEPA issued a Violation Notice to Aqua for its failure to provide water that is assuredly safe in quality, clean, adequate in quantity, and of satisfactory mineral characteristics for ordinary domestic consumption in University Park. This Violation Notice was issued due to the elevated levels of lead in the University Park tap water that exceeded the EPA lead action level in the May 2019 testing.

66.     However, Aqua failed to undertake any type of corrosion control study to investigate the cause of the elevated lead levels in the May 2019 water testing.

      **J.**     **Aqua Stopped the SeaQuest on June 15, 2019 Because the SeaQuest Removed the Scale on the Water Pipes, and Aqua Started Adding Orthophosphate to Put the Protective Scale Back on the Pipes**

      **1.**     **Aqua Discontinued the Use of SeaQuest on June 15, 2019**

67.     Aqua stopped adding SeaQuest to the University Park public water system on June 15, 2019.

      **2.**     **The SeaQuest Combined with the Kankakee River Water Removed the CaCO3 Scale and Caused the Elevated Lead in the Tap Water**

68.     The addition of SeaQuest to the Kankakee River water caused the elevated lead in University Park tap water.

69.     The treatment product (SeaQuest), along with removing rust, impacted the protective CaCO3 scale over time that was formerly in place on the inside of the water pipes, at solder connections, and inside fixtures, allowing lead to potentially dissolve into the water. Homes in University Park now have reduced levels of protective scale, allowing lead to dissolve into the water.

70.     A chemical reaction between a change in water treatment (SeaQuest) and lead solder within the internal plumbing of homes caused the protective layer of these pipes to be

stripped exposing the lead which dissolved into the water of certain homes in University Park.

71.     The analysis of water pipes harvested from University Park homes showed lead had dissolved from the solder and was trapped in the CaCO3 scale, and the lead in the scales could be released into the tap water if the scales were disturbed. The pipe analysis showed lead that was originally present as solder had dissolved and some portion of that lead was trapped in the scales. Some water chemistry changes likely disrupted the scale, releasing lead. If this scale is disturbed, it would be easy for loosely associated lead in the scale to be released in particulate form into the tap water.

72.     Aqua's investigation identified—supported by state and federal regulators—that the likely cause of elevated lead levels in homes is due to a change in water chemistry (from the switch to Kankakee River water and the addition of SeaQuest) combined with lead solder in the internal plumbing of homes in University Park. This combination caused the protective CaCO3 coating in these pipes to be stripped, exposing the lead solder to the water in their internal plumbing systems.

73.      The cause of the elevated lead levels in University Park was the change in the water chemistry (from the switch to Kankakee River water and the addition of SeaQuest) that lead to the activation of the lead solder to either remove itself or dissolve from the plumbing scale, and the new chemistry in the water caused that CaCO3 scale to loosen in a way that allowed the solder to be exposed and then begin releasing lead into the water.

74.     The source of the lead is tied to an adjustment in the treatment (SeaQuest) which appears to have changed the water chemistry so that existing lead in internal plumbing of older properties was released into the water. The results from the sampling throughout University Park after the Do Not Consume showed the lead results typically were associated with tin, which identifies lead solder as the source of the lead. There are no lead service lines, so the source of

17

the lead clearly was lead solder. The results showing tin with lead confirmed Aqua's suspicion that lead solder was involved.

### 3. Aqua Should Not Have Used SeaQuest With the Kankakee River Water in University Park

75.     Aqua should not have used SeaQuest with the Kankakee River water in University Park.

### 4. Aqua Started Adding Orthophosphate to University Park Water to Put the Scale Back on the Water Pipes

76.     SeaQuest was discontinued and Aqua switched to an orthophosphate (phosphoric acid) in University Park based on experiments conducted by Cornwell that that it was a better inhibitor to use than SeaQuest. Orthophosphate inhibits corrosion (*i.e.*, decreases water lead levels) by *forming* a scale on the inside of the pipe. To contrast, SeaQuest *dissolves* the scale.

77.     Aqua started feeding an orthophosphate in University Park water to put the protective CaCO3 coating back on the water pipes. Orthophosphate is known to be effective at forming a protective scale with lead and prevents it from dissolving into the water.

78.     Aqua intentionally ignored the warnings in the Snoeyink Report and the Peotone Study regarding the improper use of SeaQuest, and the preferred alternative use of orthophosphate, which resulted in the removal of CaCO3 scale and the release of elevated lead in the drinking water throughout University Park.

### K. Aqua Replaced the Do Not Consume With a Lead Advisory Area Because Aqua Could Not Assure the Tap Water Was Safe to Consume in the Homes in the Lead Advisory Area

### 1. Aqua Replaced the Do Not Consume With a Lead Advisory Area on July 29, 2019

79.     The Do Not Consume was replaced with a Lead Advisory Area on July 29, 2019.

80.     The Lead Advisory Area was an area in University Park that was identified after the Do Not Consume was issued where Aqua was able to identify the homes that had or were

18

suspected to have a potential lead issue, and were the ones that needed to take the extra precautions to protect themselves and their families from ingesting lead.

81.     The Lead Advisory Area was meant to be a temporary series of precautions and actions for the community until the corrosion control chemistry (the orthophosphate) remediated the corrosion issue. Aqua put these properties in the Lead Advisory Area because those properties had the potential for exposure to lead, and therefore, Aqua wanted them to have precautions until the corrosion chemistry was in place such that that would not take place.

82.     There were a total of 1,634 unique premises in the Lead Advisory Area from July 29, 2019 to July 10, 2024. On July 10, 2024, a Consent Order was entered in *People of the State of Illinois v. Aqua Illinois, Inc., No. 19 CH 1208 (Will County, IL)*, that changed the Lead Advisory Area to a "Customer Resources Area." Of the 1,634 premises in the Lead Advisory Area, **1,525** of them were **residences**.

83.     183 residential premises in University Park that were constructed *after 1990* were also included in the Lead Advisory Area after the Do Not Consume was lifted.

## 2.    Aqua Could Not Assure the Tap Water Was Safe to Consume in the Homes in the Lead Advisory Area

84.     At the time the Lead Advisory Area was created on July 29, 2019, the levels of lead in the University Park water testing exceeded the EPA lead action level because more than 10% of the tap water samples had a lead concentration greater than 15 ppb (*i.e.*, the results exceeded the 90th percentile for lead).

85.     Aqua implemented the Lead Advisory Area because Aqua could not assure that the finished water coming out of the University Park consumers' taps in the Lead Advisory Area was safe to consume.

86.     Because Aqua could not assure that the finished water coming out of every consumer's tap within the Lead Advisory Area was safe to consume, University Park consumers

in the Lead Advisory Area suffered the following damages:

     (a)    Expending out-of-pocket costs for bottled water, filters for water pitchers, filtration systems, medical bills, temporary lodging, and other expenses;

     (b)    Loss of time;

     (c)    Loss of income;

     (d)    The presence and potential for elevated levels of lead in the drinking water supply throughout the Village has threatened the health of Plaintiffs and Class members, and exposes them to injury and the fear of future injury, including the risk of increased and irreversible health impacts, especially to young children; and

     (e)    The lives of Plaintiffs and Class members have been disrupted on a daily basis, causing considerable stress, aggravation, annoyance, inconvenience, and discomfort.

**L.    Aqua Violated an EPA Regulation in a Secret Effort to Try to Artificially Lower the Lead Levels in Compliance Tests in 2020**

87.    After Aqua implemented the Lead Advisory Area on July 29, 2019, Aqua continued to do lead testing on University Park tap water in homes throughout the Lead Advisory Area.

88.    According to the results of the University Park residential tap water sampling, there were <u>811</u> lead test results on residential tap water sampling between <u>July 29, 2019</u> (when the Lead Advisory Area was created) through and including <u>April 28, 2023</u> that *exceeded* the EPA lead action level of 15 ppb, with the highest result being 57,900 ppb of lead.

89.    The EPA does not permit Aqua to tell its compliance testing consumers in University Park to flush the water lines in their homes prior to collecting compliance samples of water for lead testing because flushing the water lines lowers the lead test results. However, in April 2020, Aqua devised a plan to "get around" that prohibition by sending automated telephone calls with recorded messages informing the compliance testing consumers to flush the water lines in their homes prior to collecting the water samples, in an effort to artificially lower

the lead test results.

**M.**    **Aqua Acted Willfully, or With Such Gross Negligence as to Indicate a Wanton Disregard of the Rights of Others, as Aqua Inflicted a Highly Unreasonable Risk of Harm Upon Its Customers in Conscious Disregard of the Risk**

**1.**    **There is No Known Level of Lead in Drinking Water That is Safe to Consume**

90.    The Maximum Containment Level Goal ("MCLG") is the level of a containment in drinking water below which there is no known or expected risk to health. The MCLG for lead is zero (0.00).

91.    According to the U.S. EPA:

(a)    ***there is no level of lead in drinking water that is safe to consume***, and

(b)    there is no level of lead to consume and have no known or expected risk to health.

**2.**    **The Drinking Water Throughout University Park Was Contaminated With High Levels of Lead**

92.    According to the results of the University Park residential tap water sampling, there were 1,359 lead test results on residential tap water between August 23, 2018 (the August 2018 lead testing) through and including April 28, 2023 that *exceeded* the EPA lead action level of 15 ppb, with the highest result being 57,900 ppb of lead.

93.    In homes throughout the Do Not Consume and Lead Advisory Area, it was occurring that the tap water lead levels would fluctuate where they were normal at one test, and then days, months, or years later, the lead levels were greater than 15 ppb, and then days, months, or years later, they would be normal. The lead levels fluctuated within each home, and from one home to the next.

94.    There were homes constructed ***after 1990*** that were tested for lead after the Do Not Consume advisory and their water lead test results were ***greater*** than 15 ppb.

### 3. Aqua Could Not Assure the Tap Water Was Safe to Consume for All Residents Throughout University Park

95. Aqua could not assure that the finished water coming out of every University Park consumer's tap was safe to consume for all consumers subject to the Do Not Consume and/or Lead Advisory Area.

### 4. Lead Can Cause Serious Health Problems if it is Ingested From Drinking Lead-Contaminated Water

96. Consuming lead contaminated water can cause damage to a person's brain and kidneys, and can interfere with the production of red blood cells that carry oxygen to all parts of their body.

97. The greatest risk of lead exposure from consuming lead contaminated water is to young infants, young children, and pregnant women.

98. Scientists have linked the effects of lead on the brain with lowered IQ in children, and consuming lead contaminated water can cause lowered IQ in children.

99. Adults with kidney problems and high blood pressure can be affected by consuming low levels of lead more than healthy adults.

100. Lead from consuming lead contaminated water can be stored in a person's bones and it can be released into the blood later in their life.

101. During pregnancy, the child receives lead from the mother's blood which comes from the mother's bones, and may affect the fetus' brain development.

102. Infants and children who drink water containing lead in excess of the lead action level could experience delays in their physical or mental development.

103. Children who consume lead contaminated water could show slight deficits in attention span and learning abilities.

104.    Adults who consume lead contaminated water over many years could develop kidney problems or high blood pressure.

###     5.    The Elevated Lead Throughout University Park Water Caused Extensive Harm to All Residents, Regardless of Whether They Had Elevated Lead in Their Tap Water

105.    Aqua's Do Not Consume notice instructed all University Park customers to not consume their tap water, and instead "use bottled or filtered water for drinking, preparing formula, making ice, brushing teeth and food preparation, until further notice."

106.    The University Park residents should not have ignored Aqua's Do Not Consume advisory.

107.    183 residential premises in University Park that were constructed *after 1990* were in the Lead Advisory Area after the Do Not Consume was lifted. Aqua stated these customers continue to be advised to alter their home water use and likely believe it is necessary to use bottled water. Aqua stated these customers believe their water cannot be used normally resulting in great inconvenience (*e.g.,* advised to alter water use, and believe water cannot be used).

108.    The University Park residents did not have a better knowledge than Aqua had regarding what was causing the elevated lead in the tap water throughout University Park.

109.    The University Park residents did not have a better knowledge than Aqua had regarding which homes throughout University Park had elevated levels of lead in their tap water.

110.    When tap water lead levels are fluctuating between normal and elevated lead levels in homes throughout the Lead Advisory Area, and Aqua is advising them to alter their home water use, it is reasonable for all customers in the Lead Advisory Area to think their water may not be safe to drink out of the tap.

111.    The University Park residents should not have ignored Aqua's guidance in the Lead Advisory Advisory.

23

112. Not drinking the tap water in their homes is a disruption that all residents who were under the Do Not Consume or in the Lead Advisory Area may have experienced, *regardless* of whether they had their tap water tested for lead.

113. The Do Not Consume and Lead Advisory Area encompassed more limitations than simply not drinking the tap water.

114. Using bottled or filtered water for drinking, cooking food, washing dishes, and making ice are disruptions that all residents who were under the Do Not Consume or in the Lead Advisory Area may have experienced, *regardless* of whether they had their tap water tested for lead.

115. Using bottled or filtered water to wash their face, brush their teeth, or bathe themselves are disruptions that all residents who were under the Do Not Consume or in the Lead Advisory Area may have experienced, *regardless* of whether they had their tap water tested for lead.

116. Using bottled water to water a resident's vegetable garden or wash their vegetables, if they were going to eat those vegetables, is a disruption that all residents who were under the Do Not Consume or in the Lead Advisory Area may have experienced, *regardless* of whether they had their tap water tested for lead.

117. Spending time driving to pick up, or waiting to pick up, bottled water or filters are disruptions that all residents who were under the Do Not Consume or in the Lead Advisory Area may have experienced, *regardless* of whether they had their tap water tested for lead.

118. Having difficulty carrying bottled water provided by Aqua is a disruption that all residents who were under the Do Not Consume or in the Lead Advisory Area may have experienced, *regardless* of whether they had their tap water tested for lead.

119.    Spending time replacing filters in faucets or pitchers is a disruption that all residents who were under the Do Not Consume or in the Lead Advisory Area may have experienced, *regardless* of whether they had their tap water tested for lead.

120.    Spending time running tap water through the faucet before using the water is a disruption that all residents who were under the Do Not Consume or in the Lead Advisory Area may have experienced, *regardless* of whether they had their tap water tested for lead.

121.    Spending time reviewing news reports, notifications, or community updates regarding the water quality issues are disruptions that all residents who were under the Do Not Consume or in the Lead Advisory Area may have experienced, *regardless* of whether they had their tap water tested for lead.

122.    Spending time attending or watching public meetings regarding the water quality issues are disruptions that all residents who were under the Do Not Consume or in the Lead Advisory Area may have experienced, *regardless* of whether they had their tap water tested for lead.

123.    Spending time calling Aqua, University Park, or others regarding the water quality issues are disruptions that all residents who were under the Do Not Consume or in the Lead Advisory Area may have experienced, *regardless* of whether they had their tap water tested for lead.

124.    Being concerned about, or spending time researching, health effects related to the water quality issues are disruptions that all residents who were under the Do Not Consume or in the Lead Advisory Area may have experienced, *regardless* of whether they had their tap water tested for lead.

125.    Seeking medical care or testing regarding the water quality issues for oneself, loved ones, or pets are disruptions that all residents who were under the Do Not Consume or in

the Lead Advisory Area may have experienced, *regardless* of whether they had their tap water tested for lead.

126. Enduring stress, annoyance, discomfort, or inconvenience, or not being able to fully use and enjoy their residence or business, are disruptions that all residents who were under the Do Not Consume or in the Lead Advisory Area may have experienced, *regardless* of whether they had their tap water tested for lead.

127. University Park residents' damages result from Aqua's inability to assure the tap water was safe to consume in homes throughout the village, *regardless* of whether a household had an elevated lead test and regardless of the age of the home.

128. University Park residents do *not* need to have common levels of lead in their tap water in order for the not-assuredly-safe water to have a common impact on the residents.

129. The not-assuredly-safe water has a common impact on University Park residents *regardless* of whether a resident incurred any costs or expenses.

130. University Park residents sustained damages even if they did not drink the tap water prior to the Do Not Consume.

**N.    Having Knowledge of the Impending Danger of the Release of Lead Into University Park Water, Aqua Failed to Exercise Ordinary Care to Prevent the Danger**

131. As set forth above, Aqua failed to exercise ordinary care to prevent the known risk of lead release into University Park drinking water, as follows:

> (a)    Aqua knowingly rushed the Kankakee River water main into service without a permit, in violation of the law, so Aqua could increase its water charges to University Park customers;

> (b)    Aqua knowingly started adding SeaQuest to the Kankakee River water in University Park in December 2017 without a construction permit or an operating permit for the chemical feed equipment to do that, in violation of the law, so Aqua could increase its water charges to University Park customers;

(c)     Aqua failed to perform any studies or testing to determine what the initial SeaQuest dosage should be in University Park;

(d)     Prior to the switch to Kankakee River water in December 2017, Aqua failed to perform any coupon studies, increased water studies, or additional water testing relative to Kankakee River water and SeaQuest;

(e)     The August 2017 Snoeyink Report was the only evaluation performed relative to Kankakee River water and SeaQuest as it relates to corrosion control within the water pipes in University Park, and Aqua ignored *all* of the warnings raised in the Snoeyink Report, as follows:

    i.     Aqua failed to perform any corrosion control studies or any other studies to try to explain the discrepancy regarding whether the inner surfaces of University Park water pipes were covered with CaCO3 scale;

    ii.     Aqua did nothing to determine whether adding SeaQuest to the Kankakee River water would cause the water to be undersaturated with CaCO3, or whether that would lead to the dissolution of CaCO3-containing scales from the University Park water pipes;

    iii.     Aqua did nothing to determine whether the SeaQuest would sequester some of the calcium and cause the water to be undersaturated with CaCO3, which can lead to the dissolution of CaCO3 deposits on the University Park water pipes;

    iv.     Aqua did nothing to determine whether the different chemistry of the Kankakee River water would release CaCO3 deposits from University Park water pipes, and whether SeaQuest would increase the magnitude of the release of CaCO3 deposits from the pipes;

    v.     Aqua did nothing to determine whether University Park tap water lead values would increase if CaCO3 deposits covering lead/tin solder and brass fixture surfaces are removed; and

    vi.     Aqua did nothing to avoid water quality changes (after the switch to Kankakee River water) that would cause the removal of CaCO3 scales and allow lead to be released into the University Park drinking water;

(f)     The Snoeyink Report warned that SeaQuest dosage control will be especially important to control whether SeaQuest dissolves CaCO3 scales from the University Park water pipes, and Aqua's water switch protocol required Aqua to verify that SeaQuest was being fed into the University Park water system at the correct dosage. Aqua ignored the Snoeyink warning, and violated its water switch protocol, as follows:

    i.    Aqua failed to document—and does not know—the actual amount of SeaQuest that Aqua was adding into the University Park Public Water Supply after the switch to Kankakee River water;

    ii.    There is no information or documents showing Aqua was actually verifying that SeaQuest was being fed into the University Park water system at the correct dosage; and

    iii.    Aqua's calculations of its estimated SeaQuest dosing show, from the date of the water switch to the Do Not Consume, Aqua was adding *5 times more* SeaQuest to the University Park public water system than it was supposed to add;

(g)    Aqua's improper use of SeaQuest with Kankakee River water in University Park removed the CaCO3 scale on the inside of the water pipes and caused lead to be released into the drinking water throughout the village;

(h)    Aqua violated its water switch protocol by failing to perform any lead and copper testing within one month after switching the water source from groundwater wells to Kankakee River water in University Park;

(i)    The August 2018 residential tap water sampling was the first time that lead testing was performed after the switch to Kankakee River water, and it showed elevated lead levels for the ***first time in the history*** of University Park. Thereafter:

    i.    Aqua knowingly violated the Lead and Copper Rule by failing to provide the required written notice of the elevated lead to each of the University Park customers;

    ii.    Aqua improperly collected one additional water sample to "dilute" the testing pool and bring the overall lead test results to **0.1 ppb below** the EPA lead action level, and Aqua stopped testing after collecting that one sample;

    iii.    The IEPA issued two Violation Notices to Aqua, and the U.S. EPA required Aqua to admit that it could not ensure the quality of the University Park drinking water from July – December 2018, due to Aqua's sampling misconduct; and

    iv.    Aqua did nothing to investigate the cause of the elevated lead levels in University Park tap water following the August 2018 testing;

(j)    The January 2019 Peotone Study warned that SeaQuest should not be added alone due to the observed increase of lead in the water, and if SeaQuest is needed, an orthophosphate should be added to reduce the lead release in the water. Aqua ignored the expert's warnings, as follows:

      i.     Aqua continued adding SeaQuest alone in University Park and Aqua did nothing to evaluate the rationale for continuing to use SeaQuest in University Park water, as opposed to discontinuing SeaQuest altogether; and

      ii.    Aqua did not add an orthophosphate to the SeaQuest in University Park and Aqua did nothing to evaluate the rationale for either adding an orthophosphate, or not adding an orthophosphate, in University Park water;

(k)   The May 2019 residential tap water sampling was the second time that lead testing was performed after the switch to Kankakee River water, and it also showed elevated lead levels in University Park tap water. Thereafter:

      i.     On June 14, 2019, Aqua issued a Do Not Consume notice for all customers in the entire University Park service area—including 1,902 residences—because Aqua did not know what was causing the elevated lead levels or how widespread it was throughout University Park;

      ii.    At the time Aqua issued the Do Not Consume notice, Aqua could not assure that the finished water coming out of every University Park consumer's tap was safe to consume;

      iii.   The IEPA issued a Violation Notice to Aqua for its failure to assure that the water it provided to University Park was safe to consume; and

      iv.   Aqua failed to undertake any type of corrosion control study to investigate the cause of the elevated lead levels in the May 2019 water testing;

(l)   It was not until June 15, 2019—*after* the Do Not Consume—that Aqua discontinued SeaQuest and started adding an orthophosphate to the University Park water. This eventual change in chemicals was based on Cornwell's warning in the January 2019 Peotone Study that Aqua had ignored;

(m)  On July 29, 2019, Aqua replaced the Do Not Consume with a Lead Advisory Area because Aqua could not assure that the finished water coming out of the University Park consumers' taps in the Lead Advisory Area—including 1,525 residences—was safe to consume; and

(n)   Aqua intentionally violated an EPA regulation by secretly informing University Park compliance testing consumers to flush the water lines in their homes prior to collecting the water samples, in an effort to artificially lower the lead test results in 2020.

29

**O.** **Aqua Has a Pattern and Practice of Engaging in Misconduct and Violating the Law**

132.    It was a regular practice for Aqua to put water pipelines into service without an operating permit.

133.    It was a regular practice for Aqua to add chemicals to municipal public water supplies without an operating permit.

134.    The IEPA issued Violation Notices to Aqua for Aqua's failure to obtain operating permits for construction projects in 2005, 2006 (3 violations), 2008, 2009 (6 violations), 2010 (2 violations), and 2012.

135.    The IEPA issued Violation Notices to Aqua dating back to 1998 for Aqua's failure to appropriately monitor water quality in University Park, including requiring Aqua to provide public notice to University Park customers of its water quality monitoring violations.

136.    Aqua pumped polluted (not potable) water from the Kankakee Water Treatment Plant into the Kankakee River every day from 2018 (prior to the Do Not Consume) to 2020 without a permit. This was an ongoing illegal discharge of polluted water into the Kankakee River.

137.    In January 2024, the IEPA issued a violation notice to Aqua for providing public drinking water that Aqua could not assure was safe to consume due to Aqua's failure to properly treat the water.

**P.** **Punitive Damages Should Be Awarded Against Aqua**

138.     "Punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Barton v. Chicago & N. W. Transp. Co.*, 325 Ill. App. 3d 1005, 1030 (1st Dist. 2001).

30

139.    "[C]onduct characterized as willful and wanton may be proven where the acts have been less than intentional—*i.e.*, where there has been a failure after knowledge of impending danger, to exercise ordinary care to prevent the danger." *Ravizza v. PACCAR, Inc.*, 2020 IL App (1st) 181109-U, ¶ 118 (*quoting Ziarko v. Soo Line R.R. Co.*, 161 Ill. 2d 267, 274 (1994)).

140.    As set forth above, there is a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages:

(a)    Aqua acted willfully, or with such gross negligence as to indicate a wanton disregard of the rights of University Park consumers;

(b)    Aqua inflicted a highly unreasonable risk of harm upon University Park consumers in conscious disregard of the risk;

(c)    Having knowledge of the impending danger of the release of lead into University Park water, Aqua failed to exercise ordinary care to prevent the danger; and

(d)    Aqua has a pattern and practice of engaging in misconduct and violating the law.

141.    Punitive damages should be awarded to punish Aqua for its misconduct, and to deter other owners and operators of public water systems from engaging in similar misconduct.

## V.    APPLICABLE STATUTORY AND REGULATORY FRAMEWORK

### A.    The Illinois Environmental Protection Act

142.    The Illinois Environmental Protection Act ("Act") provides, in relevant part, that "No person shall: (a) Cause or threaten or allow the discharge of any contaminants into the environment in any state so as to cause or tend to cause water pollution in Illinois, either alone or in combination with matter from other sources…" 415 ILCS 5/12(a).

143.    Aqua is an Illinois corporation and, thus, is a "person" as defined by the Act. 415 ILCS 5/3.315.

144.    As used in the Act, the term "contaminant" means "any solid, liquid, or gaseous

31

matter, any odor, or any form of energy, from whatever source." 415 ILCS 5/3.165.

145.    The Act defines "water pollution" as "such alteration of the physical, thermal, chemical, biological or radioactive properties of any waters of the state, or such discharge of any contaminant into any waters of the state, as will or is likely to create a nuisance or render such waters harmful or detrimental or injurious to public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate uses, or to livestock, wild animals, birds, fish, or other aquatic life." 415 ILCS 5/3.545.

146.    As used in the Act, the term "waters" means "all accumulations of water, surface and underground, natural, and artificial, public and private, or parts thereof, which are wholly or partially within, flow through, or border upon this state." 415 ILCS 5/3.550.

147.    The U.S. Environment Protection Agency defines "environment" as "(1) the navigable waters, the waters of the contiguous zone, and the ocean waters of which the natural resources are under the exclusive management authority of the United States under the Fishery Conservation and Management Act of 1976, and (2) any other surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States." 42 C.F.R. § 302.3. *See also* 42 U.S.C. § 9601(8) (definition of "environment" in CERCLA statute).

148.    "Drinking water supply" means "any raw or finished water source that is or may be used by a public water system (as defined in the Safe Drinking Water Act) or as drinking water by one or more individuals." 42 U.S.C. § 9601(7).

1.    **Aqua Caused or Threatened or Allowed the Discharge of SeaQuest Into the Drinking Water Supply Throughout the Village Caused or Tended to Cause Water Pollution in The Village**

149.    Aqua caused or allowed the discharge of a chemical (*i.e.*, SeaQuest) into the drinking water supply throughout the Village. SeaQuest is a "contaminant" as defined by the

32

Act, because it is a solid or liquid matter. See 415 ILCS 5/3.165.

150.    Thus, Aqua caused or allowed the discharge of a contaminant (*i.e.*, SeaQuest) into the environment.

151.    The contaminant (*i.e.*, SeaQuest) that Aqua caused or allowed to be discharged into the environment caused or tended to cause alteration of the physical, thermal, chemical, biological or radioactive properties of the drinking water supply throughout the Village because the contaminant (*i.e.*, SeaQuest) caused or tended to cause the drinking water supply to be undersaturated with calcium carbonate (CaCO3) and this water chemistry change caused or tended to cause the drinking water supply to remove the CaCO3 deposits coating the inside of the water distribution pipes within the Village.

152.    The contaminant (*i.e.*, SeaQuest) that Aqua caused or allowed to be discharged into the environment caused or tended to cause the removal of the CaCO3 deposits coating the inside of the water distribution pipes within the Village because that is what the contaminant (*i.e.*, SeaQuest) is formulated and intended to do.

153.    As set forth above, there is no level of lead in drinking water that is safe to consume, and there is no level of lead to consume and have no known or expected risk to health.

154.    The alteration of the physical, thermal, chemical, biological or radioactive properties of the drinking water supply throughout the Village (*i.e.*, the undersaturation of the water with CaCO3) that was caused or tended to be caused by the contaminant (*i.e.*, SeaQuest) that Aqua caused or allowed to be discharged into the environment did create or was likely to create a nuisance or render the drinking water supply harmful or detrimental or injurious to public health, safety or welfare because the altered drinking water supply (*i.e.*, the undersaturation of the water with CaCO3) removed or tended to cause the removal of the CaCO3 deposits coating the inside of the water distribution pipes within the Village which exposed or

tended to expose lead/tin solder and allowed or tended to allow elevated levels of lead to be deposited into the drinking water supply.

155.    The contaminant (*i.e.*, SeaQuest) that Aqua caused or allowed to be discharged into the environment did create or was likely to create a nuisance or render the drinking water supply harmful or detrimental or injurious to public health, safety or welfare because the contaminant (*i.e.*, SeaQuest) removed or tended to cause the removal of the CaCO3 deposits coating the inside of the water distribution pipes within the Village which exposed or tended to expose lead/tin solder and allowed or tended to allow elevated levels of lead to be deposited into the drinking water supply.

156.    Thus, Aqua caused or allowed the discharge of a contaminant (*i.e.*, SeaQuest) into the environment so as to cause or tend to cause water pollution in the Village, in violation of 415 ILCS 5/12(a).

> **2.    Aqua Caused or Threatened or Allowed the Discharge of Lead Into the Drinking Water Supply Throughout the Village Caused or Tended to Cause Water Pollution in The Village**

157.    Aqua also caused or threatened or allowed the discharge of lead into the drinking water supply throughout the Village. Lead is a "contaminant" as defined by the Act, because it is a solid or liquid matter. *See* 415 ILCS 5/3.165.

158.    Thus, Aqua caused or threatened or allowed the discharge of a contaminant (*i.e.*, lead) into the environment.

159.    The contaminant (*i.e.*, lead) that Aqua caused or threatened or allowed to be discharged into the environment caused or tended to cause alteration of the physical, thermal, chemical, biological or radioactive properties of the drinking water supply throughout the Village because the contaminant (*i.e.*, lead) caused or threatened or allowed the drinking water supply to be contaminated with elevated levels of lead.

160.     As set forth above, there is no level of lead in drinking water that is safe to consume, and there is no level of lead to consume and have no known or expected risk to health.

161.     The contaminant (*i.e.*, lead) that Aqua caused or threatened or allowed to be discharged into the environment did create or was likely to create a nuisance or render the drinking water supply harmful or detrimental or injurious to public health, safety or welfare because the contaminant (*i.e.*, lead) caused or tended to cause the drinking water supply to be contaminated with elevated levels of lead.

162.     Thus, Aqua caused or threatened or allowed the discharge of a contaminant (*i.e.*, lead) into the environment so as to cause or tend to cause water pollution in the Village, in violation of 415 ILCS 5/12(a).

### 3. Aqua Knowingly Caused, Threatened, or Allowed the Distribution of Water From the Public Water Supply to Have a Quality That Was Injurious To Human Health

163.     The Act further provides that "no person shall knowingly cause, threaten or allow the distribution of water from any public water supply of such quality or quantity as to be injurious to human health." 415 ILCS 5/18(a)(1).

164.     Aqua knowingly caused or threatened or allowed the distribution of water from the Village's Public Water Supply with a quality (*i.e.*, the presence of SeaQuest that caused lead to leach into Plaintiffs' and Class members' tap water) that was injurious to human health, in violation of 415 ILCS 5/18(a)(1).

### 4. Aqua Failed to Provide Water That Was Assuredly Safe

165.     Violations of the Public Water Supply Regulations ("PWS Regulations") adopted by the Illinois Pollution Control Board ("Board") pursuant to its authority under the Act also constitute violations of the Act. 415 ILCS 5/12(a) ("No person shall…cause or threaten or allow the discharge of any contaminants into the environment in any state…so as to violate regulations

35

or standards adopted by the Pollution Control Board under [the] Act."); 415 ILCS 5/18(a)(2) ("No person shall…violate regulations or standards adopted by the…Board under this Act.").

166.    Prior to July 26, 2019, Section 601.101 of the Board's PWS Regulations provided, as follows:

> Owners and official custodians of a public water supply in the State of Illinois shall provide pursuant to the Environmental Protection Act [415 ILCS 5] (Act), the Pollution Control Board (Board) Rules, and the Safe Drinking Water Act (42 U.S.C. 300f, *et seq.*), continuous operation and maintenance of public water supply facilities so that the water shall be assuredly safe in quality, clean, adequate in quantity, and of satisfactory mineral characteristics for ordinary domestic consumption.

Section 601.101 of the Board's PWS Regulations now states, as follows:

> Owners and official custodians of a public water supply in the State of Illinois must provide, under the Act, Board Rules, and the Safe Drinking Water Act (42 U.S.C. 300f, *et seq.*), continuous operation and maintenance of public water supply facilities to assure that the water is safe in quality, clean, adequate in quantity, and of satisfactory mineral characteristics for ordinary domestic consumption.

35 Ill.Adm.Code 601.101, effective July 26, 2019.

167.    As set forth above, Aqua's actions resulted in the water provided to Plaintiffs and Class members to not be "assuredly safe" in quality for ordinary domestic consumption, in violation of 35 Ill.Adm.Code 601.101, which in turn violates 415 ILCS 5/12(a) and 415 ILCS 5/18(a)(2).

**B.    CERCLA**

168.    Under CERCLA, a responsible party is liable for any necessary costs incurred by a person in response to a release or threatened release of a hazardous substance.  42 U.S.C. § 9607(a)(1)(B).  Thus, "CERCLA liability attaches when a plaintiff establishes that: (1) the site in question is a 'facility' as defined by CERCLA; (2) the defendant is a responsible party; (3) there has been a release or there is a threatened release of hazardous substances; and (4) the plaintiff has incurred costs in response to the release or threatened release."  *E.g.*, *Sycamore Indus. Park*

36

*Associates v. Ericsson, Inc.*, 546 F.3d 847, 850 (7th Cir. 2008).

169.    The Public Water System is a "facility," as that term is defined by CERCLA.  42 U.S.C. § 9601(9) (defining the term "facility" as referring to, *inter alia*, "any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works)").

170.    As the owner and operator of the Public Water System (*i.e.*, a "facility"), Aqua is a responsible party, as contemplated by CERCLA.  *E.g.*, 42 U.S.C. § 9607(a)(1) (providing for liability against "the owner and operator of…a facility"); *Metro. Water Reclamation Dist. of Greater Chicago v. N. Am. Galvanizing & Coatings, Inc.*, 473 F.3d 824, 827 (7th Cir. 2007) (noting that "the owner and operator of…a facility" is one of the "four statutory categories" of "responsible parties" established by 42 U.S.C. § 9607(a)).

171.    As used in CERCLA, the term "hazardous substance" includes, *inter alia*, "any element, compound, mixture, solution, or substance designated" by the United States Environmental Protection Agency ("US EPA"), pursuant to 42 U.S.C. § 9602.  42 U.S.C. § 9601(14).

172.    The US EPA has designated lead as a "hazardous substance," pursuant to 42 U.S.C. § 9602. 40 C.F.R. § 302.4. Therefore, lead is a "hazardous substance," as that term is defined by CERCLA.  42 U.S.C. § 9601(14); 40 C.F.R. § 302.4.

173.    As used in CERCLA, the term "release" means "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment."  42 U.S.C. § 9601(22).

174.    As used in CERCLA, the term "environment" refers to, *inter alia*, any "surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States."  42 U.S.C. § 9601(8).

37

175.    As used in CERCLA, the term "drinking water supply" refers to, *inter alia*, "any raw or finished water source that is or may be used…as drinking water by one or more individuals." 42 U.S.C. § 9601(7).

176.    Based on the foregoing, the leaching of lead (or threatened leaching of lead) into the tap water in Plaintiffs' and Class members' homes constituted a "release" or threatened "release" of a "hazardous substance," as those terms are defined by CERCLA. *E.g.*, 42 U.S.C. § 9601(7); 42 U.S.C. § 9601(8); 42 U.S.C. § 9601(14); 42 U.S.C. § 9601(22); 40 C.F.R. § 302.4.

177.    As used in CERCLA, the term "response" includes, *inter alia*, the "removal" of "hazardous substances" from the "environment," and actions taken to "remove" "hazardous substances" from the "environment." 42 U.S.C. § 9601(25).

178.    As used in CERCLA, the terms "remove" and/or "removal" refer to "the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release," and include the "provision of alternative water supplies." 42 U.S.C. § 9601(23).

179.    Based on the foregoing, costs incurred by Plaintiffs and Class members in connection with the "removal" of lead (*i.e.*, a "released" "hazardous substance") from the tap water in their homes (*i.e.*, "the environment") are "costs of response," as contemplated by 42 U.S.C. § 9607(a)(1)(B). *E.g.*, 42 U.S.C. § 9601(7); 42 U.S.C. § 9601(8); 42 U.S.C. § 9601(14); 42 U.S.C. § 9601(22); 42 U.S.C. § 9601(23); 42 U.S.C. § 9601(25); 40 C.F.R. § 302.4.

## VI.    CLASS ALLEGATIONS

### A.    Rule 23 Allegations

180.    **Class Definition**: Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3), and (c)(4), on behalf of a class of similarly situated individuals ("the Class"), defined as follows:

> All persons and entities in the Village of University Park, Illinois who obtained water from the drinking water supply and were under a "do not consume" notice or "lead advisory" at any time during the Class Period.

Excluded from the Class are: (1) Aqua, Aqua's agents; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person and entity who executes and files a timely request for exclusion from the Class; (4) any persons and entities who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person and entity.

181.    **Class Period:** The Class Period begins in 2017, when Aqua caused or allowed SeaQuest to be discharged into the drinking water supply throughout the Village.

182.    **Numerosity**: The Class consists of thousands of individuals and entities, and is so numerous that joinder of all members of the Class is impracticable, given that (1) the "do not consume" notice affected everyone in the Village, including more than 1,900 residential connections, (2) the U.S. Census Bureau recorded a population of 7,129 in the Village in the 2010 census, and (3) the U.S. Census Bureau estimates a population of 7,020 in the Village as of July 1, 2022.[1]  In addition, the Lead Advisory Area consists of over 1,500 residential connections in the Village. Class members can be easily identified through Aqua's records or by other means.

183.    **Commonality and Predominance**: Plaintiffs assert that, as the owner and operator of the Village's public water system, Aqua had a legal duty to provide water to

---

[1] *See* https://www.census.gov/quickfacts/fact/table/universityparkvillageillinois/PST045222

Plaintiffs and Class members that was not excessively corrosive or otherwise deleterious so that their tap water was assuredly safe for human consumption. Plaintiffs further assert that, in derogation of this legal duty, Aqua's actions and inactions regarding Aqua's source water switch for the public water system in the Village from groundwater wells to the Kankakee River, and the introduction of SeaQuest into the public water system, ultimately led to (1) a Village-wide water crisis, (2) the Do Not Consume advisory which, by definition, informed all consumers in the Village that Aqua could not assure that the finished water coming out of every University Park consumer's tap was safe to consume, and that, as a result, they should no longer consume it, and (3) the slightly more limited, but still substantially inclusive, Lead Advisory Area, which informed more than 1,500 consumers in the Village that Aqua could not assure that the finished water coming out of the University Park consumer's taps in the Lead Advisory Area was safe to consume, and they had to filter it, or else they should continue to use bottled water. Common questions of fact and law include:

(1) whether Aqua knowingly rushed the Kankakee River water main into service without an operating permit, so it could start delivering Kankakee River water to University Park by the end of 2017, in order to increase its water charges to University Park customers as part of its pending rate case;

(2) whether Aqua knowingly started adding SeaQuest to the Kankakee River water in University Park in December 2017 without a construction permit or an operating permit for the chemical feed equipment to do that, so Aqua could increase its water charges to University Park customers as part of its pending rate case;

(3) whether, prior to the switch to Kankakee River water in December 2017, Aqua failed to perform any coupon studies, increased water studies, or additional water testing relative to Kankakee River water and SeaQuest;

(4) whether, prior to the switch to Kankakee River water in December 2017, Aqua failed to perform any studies or testing to determine what the initial SeaQuest dosage should be in University Park;

(5) whether, prior to the switch to Kankakee River water in December 2017, Aqua failed to perform any corrosion control studies or any other studies

to try to explain the discrepancy regarding whether the inner surfaces of University Park water pipes were covered with a calcium carbonate (CaCO3) scale;

(6)     whether, prior to the switch to Kankakee River water in December 2017, Aqua did anything to determine whether the SeaQuest would sequester some of the calcium, cause the water to be undersaturated with CaCO3, and lead to the dissolution of CaCO3 deposits on the University Park water pipes;

(7)     whether the Snoeyink Report warned that adding SeaQuest to the Kankakee River water would cause the water to be undersaturated with CaCO3 and lead to the dissolution of CaCO3-containing scales from the University Park water pipes, and whether Aqua ignored this warning;

(8)     whether, prior to the switch to Kankakee River water in December 2017, Aqua did anything to determine if the different chemistry of the Kankakee River water would release CaCO3 deposits from University Park water pipes, and if SeaQuest would increase the magnitude of the release of CaCO3 deposits from the pipes after the water switch;

(9)     whether the Snoeyink Report warned that the different chemistry of the Kankakee River water could release CaCO3 deposits from University Park water pipes, and SeaQuest may increase the magnitude of the release of CaCO3 deposits from the pipes after the water switch, and whether Aqua ignored this warning;

(10)    whether, prior to the switch to Kankakee River water in December 2017, Aqua did anything to determine if University Park tap water lead values would increase if CaCO3 deposits covering lead/tin solder and brass fixture surfaces are removed from the water pipes;

(11)    whether the Snoeyink Report warned that University Park tap water lead values could increase if CaCO3 deposits covering lead/tin solder and brass fixture surfaces are removed from the water pipes, and whether Aqua ignored this warning;

(12)    whether Aqua Aqua did anything to avoid water quality changes (after the switch to Kankakee River water) that would cause the removal of CaCO3 scales and allow lead to be released into the University Park drinking water;

(13)    whether the Snoeyink Report warned that Aqua should avoid water quality changes (after the switch to Kankakee River water) that would cause the removal of CaCO3 scales and allow lead to be released into the University Park drinking water, and whether Aqua ignored this warning;

(14)     whether Aqua failed to document—and does not know—the actual amount of SeaQuest that Aqua was adding into the University Park public water supply after the switch to Kankakee River water;

(15)     whether Aqua's calculations of its estimated SeaQuest dosing show, from the date of the water switch to the Do Not Consume, Aqua was adding more SeaQuest to the University Park public water system than it was supposed to add;

(16)     whether the Snoeyink Report warned that SeaQuest dosage control will be especially important to control whether SeaQuest dissolves CaCO3 scales from the University Park water pipes, and whether Aqua ignored this warning;

(17)     whether Aqua's water switch protocol required Aqua to verify that SeaQuest was being fed into the University Park water system at the correct dosage, and whether Aqua violated this protocol;

(18)     whether Aqua's use of SeaQuest with Kankakee River water in University Park removed the CaCO3 scale on the inside of the water pipes and caused lead to be released into the drinking water throughout the Village;

(19)     whether Aqua performed any lead and copper testing in University Park tap water within one month after switching the water source to Kankakee River water;

(20)     whether Aqua's water switch protocol required Aqua to perform lead and copper testing in University Park tap water within one month after switching the water source to Kankakee River water, and whether Aqua violated this protocol;

(21)     whether Aqua did anything to investigate the source of the elevated lead in the August 2018 residential tap water testing in University Park;

(22)     whether Chapter 4 of the Lead and Copper Rule required Aqua to provide written notice of the elevated lead in the August 2018 water testing to each of the University Park customers, and whether Aqua violated this Rule by failing to provide this written notice;

(23)     whether it was proper for Aqua to collect one additional water sample to bring the overall lead test results below the EPA lead action level for the August 2018 water testing;

(24)     whether, at the time of the August 2018 water testing, Aqua could not assure that the finished water coming out of every University Park consumer's tap was safe to consume;

42

(25)     whether, from January 2019 to the Do Not Consume, Aqua continued adding SeaQuest alone in University Park and did nothing to evaluate the rationale for continuing to use SeaQuest in University Park water, as opposed to discontinuing SeaQuest altogether;

(26)     whether, from January 2019 to the Do Not Consume, Aqua did not add an orthophosphate to the SeaQuest in University Park and did nothing to evaluate the rationale for either adding an orthophosphate, or not adding an orthophosphate, in University Park water;

(27)     whether the January 2019 Peotone Study warned that SeaQuest should not be added alone due to the observed increase of lead in the water, and if SeaQuest is needed, an orthophosphate should be added to reduce the lead release in the water, and whether Aqua ignored those warnings;

(28)     whether, at the time Aqua issued the Do Not Consume, Aqua did not know what was causing the elevated lead levels or how widespread it was throughout University Park;

(29)     whether, at the time Aqua issued the Do Not Consume, Aqua could not assure that the finished water coming out of every University Park consumer's tap was safe to consume;

(30)     whether Aqua undertook any type of corrosion control study to investigate the cause of the elevated lead levels in the May 2019 water testing;

(31)     whether, at the time Aqua created the Lead Advisory Area, Aqua could not assure that the finished water coming out of the University Park consumers' taps in the Lead Advisory Area was safe to consume;

(32)     whether, in homes throughout the Do Not Consume and Lead Advisory Area, it was occurring that the tap water lead levels would fluctuate between normal and elevated levels within each home, and from one home to the next;

(33)     whether it was reasonable for customers in University Park who were subject to the Do Not Consume and Lead Advisory Area to think that their water may not be safe to drink out of the tap;

(34)     whether there is any level of lead in drinking water that is safe to consume;

(35)     whether Aqua could not assure that the finished water coming out of every University Park consumer's tap was safe to consume for all consumers subject to the Do Not Consume and/or Lead Advisory Area;

(36)     whether it was appropriate for University Park residents to follow Aqua's guidance in the Do Not Consume and Lead Advisory Area, and abstain from using/consuming their tap water;

(37)     whether the Do Not Consume and Lead Advisory Area encompassed more limitations than simply not drinking the tap water;

(38)     whether all residents who were under the Do Not Consume or in the Lead Advisory Area may have experienced disruptions in their lives, regardless of whether they had their tap water tested for lead;

(39)     whether University Park residents' damages result from Aqua's inability to assure the tap water was safe to consume in homes throughout the Village (including homes in the Lead Advisory Area constructed after 1990), regardless of whether a household had an elevated lead test, and even if they did not drink the tap water prior to the Do Not Consume;

(40)     whether Aqua had a duty to assure that the finished water coming out of every University Park consumer's tap was safe to consume;

(41)     whether Aqua breached its duty to assure that the finished water coming out of every University Park consumer's tap was safe to consume for the households subject to the Do Not Consume and/or Lead Advisory Area;

(42)     whether Aqua caused water that was not assuredly safe to enter Plaintiffs' and Class members' land through a negligent act;

(43)     whether Aqua caused water that was not assuredly safe to invade Plaintiffs' and Class members' interest in the use and enjoyment of their land; and

(44)     whether, and to what extent, Plaintiffs and Class members incurred "costs of response" in connection with Aqua's contamination of the Village's water supply, as contemplated by CERCLA.

The truth of each of these assertions is a substantive issue that will control the outcome of each of Plaintiffs' causes of action, and this case at large. A ruling in favor of Plaintiffs on these issues will demonstrate that Aqua is factually and legally responsible for the Village-wide water crisis, and will establish a right of recovery in other Class members.

184.     Additionally, Plaintiffs seek punitive damages in this case. Although some of the common questions of fact and law listed above will also be applicable to the issue of punitive damages, there are additional common questions of fact and law relative to punitive damages,

such as:

    (1)    whether it was a regular practice for Aqua to put water pipelines into service without an operating permit;

    (2)    whether it was a regular practice for Aqua to add chemicals to municipal public water supplies without an operating permit;

    (3)    whether it was a regular practice for Aqua to put construction projects into service without an operating permit, and whether the IEPA issued violation notices to Aqua for that conduct;

    (4)    whether Aqua intentionally violated an EPA regulation by secretly informing University Park compliance testing consumers to flush the water lines in their homes prior to collecting the water samples, in an effort to artificially lower the lead test results in 2020;

    (5)    whether Aqua pumped polluted (not potable) water from the Kankakee Water Treatment Plant into the Kankakee River every day from 2018 (prior to the Do Not Consume) to 2020 without a permit, and whether that constitutes an ongoing illegal discharge of polluted water into the Kankakee River;

    (6)    whether, in January 2024, the IEPA issued a violation notice to Aqua for providing public drinking water that Aqua could not assure was safe to consume due to Aqua's failure to properly treat the water;

    (7)    whether Aqua acted willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others;

    (8)    whether Aqua inflicted a highly unreasonable risk of harm upon its customers in conscious disregard of the risk;

    (9)    whether Aqua had knowledge of the impending danger of the release of lead into University Park water, and whether Aqua failed to exercise ordinary care to prevent the danger; and

    (10)    whether Aqua has a pattern and practice of engaging in misconduct and violating the law.

185.    Plaintiffs will prove the aggregate amount of Plaintiffs' and Class members' damages on a classwide basis through the use of common evidence, representative sampling, and statistical modeling.

186.     Moreover, the imposition of punitive damages turns on Defendant's conduct—which, here, was uniform with respect to Plaintiffs and Class members—and punitive damages are not designed to compensate for any particular loss. Thus, Plaintiffs' and Class members' individualized circumstances will make no difference to the resolution of whether, and to what extent, punitive damages should be imposed. *See, e.g.*, *Franz v. Calaco Dev. Corp.*, 352 Ill.App.3d 1129, 1140 (2nd Dist. 2004) ("The focus of punitive damages is not on the position of the party wronged, but the position of the party committing the wrong."); *Barton v. Chicago & N. W. Transp. Co.*, 325 Ill.App.3d 1005, 1030 (1st Dist. 2001) (explaining the justifications for punitive damages). Therefore, this issue can be determined on a classwide basis.

187.     Finally, Plaintiffs' claim for trespass entitles Plaintiffs and Class members to recover nominal damages to compensate them for the fact that a trespass occurred. *E.g.*, *Chicago Title Land Tr. Co. v. JS II, LLC*, 2012 IL App (1st) 063420, ¶ 77. The trespass claimed here is the alleged invasion of water that was not assuredly safe onto Plaintiffs' and Class members' properties. Since Plaintiffs allege the water entering onto any property subject to the Do Not Consume advisory and/or Lead Advisory Area was not assuredly safe to consume, the nature of the invasion at issue—and by extension, the amount of nominal damages that invasion warrants—would be identical across the Class.

188.     **Typicality**: The claims of the Plaintiffs are typical of the claims of the Class because all claims are based on the same legal and factual issues, and Plaintiffs and Class members were each subjected to Aqua's alleged uniform course of conduct. Specifically, Plaintiffs allege that Aqua distributed finished water to Plaintiffs and Class members that was not assuredly safe to consume, as a result of Aqua's alleged actions and inactions. Plaintiffs also allege that they and Class members all suffered damages from Aqua issuing a Do Not Consume advisory and creating a Lead Advisory Area, and that it was reasonable for all individuals within

the areas subject to the Do Not Consume advisory and/or the Lead Advisory Area to believe that their water was unsafe, abstain from using/consuming it, and take steps to remediate the situation in response to the release or threatened release of lead into their tap water.

189.    **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class, and they are committed to vigorously prosecuting this litigation. Plaintiffs have no interest antagonistic to those of the Class, and Aqua has no defenses unique to any Plaintiff. Plaintiffs' counsel can fairly and adequately represent and protect the interests of the Class members, as they have extensive experience handing complex litigation and class action lawsuits, they are competent and qualified, and they are committed to vigorously prosecuting this litigation.

190.    **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy considering the interests of the Class members in individually controlling the prosecution of separate actions, the extent and nature of any litigation concerning the controversy already commenced by Class members, the desirability or undesirability of continuing the litigation of these claims in this forum, and the difficulties likely to be encountered in the management of a class action as it relates to the claims in this action. A class action can best secure the economies of time, effort and expense, and promote uniformity in adjudications. Class certification will prevent repeated trial proceedings by thousands of Village residents to establish Aqua's alleged liability for creating a Village-wide water crisis. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class members to prosecute their claims individually. The trial and the litigation of Plaintiffs' and Class members' claims are manageable.

191.    Particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the

disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

> (1)      whether Aqua knowingly rushed the Kankakee River water main into service without an operating permit, so it could start delivering Kankakee River water to University Park by the end of 2017, in order to increase its water charges to University Park customers as part of its pending rate case;

> (2)      whether Aqua knowingly started adding SeaQuest to the Kankakee River water in University Park in December 2017 without a construction permit or an operating permit for the chemical feed equipment to do that, so Aqua could increase its water charges to University Park customers as part of its pending rate case;

> (3)      whether, prior to the switch to Kankakee River water in December 2017, Aqua failed to perform any coupon studies, increased water studies, or additional water testing relative to Kankakee River water and SeaQuest;

> (4)      whether, prior to the switch to Kankakee River water in December 2017, Aqua failed to perform any studies or testing to determine what the initial SeaQuest dosage should be in University Park;

> (5)      whether, prior to the switch to Kankakee River water in December 2017, Aqua failed to perform any corrosion control studies or any other studies to try to explain the discrepancy regarding whether the inner surfaces of University Park water pipes were covered with a calcium carbonate (CaCO3) scale;

> (6)      whether, prior to the switch to Kankakee River water in December 2017, Aqua did anything to determine whether the SeaQuest would sequester some of the calcium, cause the water to be undersaturated with CaCO3, and lead to the dissolution of CaCO3 deposits on the University Park water pipes;

> (7)      whether the Snoeyink Report warned that adding SeaQuest to the Kankakee River water would cause the water to be undersaturated with CaCO3 and lead to the dissolution of CaCO3-containing scales from the University Park water pipes, and whether Aqua ignored this warning;

> (8)      whether, prior to the switch to Kankakee River water in December 2017, Aqua did anything to determine if the different chemistry of the Kankakee River water would release CaCO3 deposits from University Park water pipes, and if SeaQuest would increase the magnitude of the release of CaCO3 deposits from the pipes after the water switch;

48

(9)     whether the Snoeyink Report warned that the different chemistry of the Kankakee River water could release CaCO3 deposits from University Park water pipes, and SeaQuest may increase the magnitude of the release of CaCO3 deposits from the pipes after the water switch, and whether Aqua ignored this warning;

(10)    whether, prior to the switch to Kankakee River water in December 2017, Aqua did anything to determine if University Park tap water lead values would increase if CaCO3 deposits covering lead/tin solder and brass fixture surfaces are removed from the water pipes;

(11)    whether the Snoeyink Report warned that University Park tap water lead values could increase if CaCO3 deposits covering lead/tin solder and brass fixture surfaces are removed from the water pipes, and whether Aqua ignored this warning;

(12)    whether Aqua Aqua did anything to avoid water quality changes (after the switch to Kankakee River water) that would cause the removal of CaCO3 scales and allow lead to be released into the University Park drinking water;

(13)    whether the Snoeyink Report warned that Aqua should avoid water quality changes (after the switch to Kankakee River water) that would cause the removal of CaCO3 scales and allow lead to be released into the University Park drinking water, and whether Aqua ignored this warning;

(14)    whether Aqua failed to document—and does not know—the actual amount of SeaQuest that Aqua was adding into the University Park public water supply after the switch to Kankakee River water;

(15)    whether Aqua's calculations of its estimated SeaQuest dosing show, from the date of the water switch to the Do Not Consume, Aqua was adding more SeaQuest to the University Park public water system than it was supposed to add;

(16)    whether the Snoeyink Report warned that SeaQuest dosage control will be especially important to control whether SeaQuest dissolves CaCO3 scales from the University Park water pipes, and whether Aqua ignored this warning;

(17)    whether Aqua's water switch protocol required Aqua to verify that SeaQuest was being fed into the University Park water system at the correct dosage, and whether Aqua violated this protocol;

(18)    whether Aqua's use of SeaQuest with Kankakee River water in University Park removed the CaCO3 scale on the inside of the water pipes and caused lead to be released into the drinking water throughout the Village;

(19)     whether Aqua performed any lead and copper testing in University Park tap water within one month after switching the water source to Kankakee River water;

(20)     whether Aqua's water switch protocol required Aqua to perform lead and copper testing in University Park tap water within one month after switching the water source to Kankakee River water, and whether Aqua violated this protocol;

(21)     whether Aqua did anything to investigate the source of the elevated lead in the August 2018 residential tap water testing in University Park;

(22)     whether Chapter 4 of the Lead and Copper Rule required Aqua to provide written notice of the elevated lead in the August 2018 water testing to each of the University Park customers, and whether Aqua violated this Rule by failing to provide this written notice;

(23)     whether it was proper for Aqua to collect one additional water sample to bring the overall lead test results below the EPA lead action level for the August 2018 water testing;

(24)     whether, at the time of the August 2018 water testing, Aqua could not assure that the finished water coming out of every University Park consumer's tap was safe to consume;

(25)     whether, from January 2019 to the Do Not Consume, Aqua continued adding SeaQuest alone in University Park and did nothing to evaluate the rationale for continuing to use SeaQuest in University Park water, as opposed to discontinuing SeaQuest altogether;

(26)     whether, from January 2019 to the Do Not Consume, Aqua did not add an orthophosphate to the SeaQuest in University Park and did nothing to evaluate the rationale for either adding an orthophosphate, or not adding an orthophosphate, in University Park water;

(27)     whether the January 2019 Peotone Study warned that SeaQuest should not be added alone due to the observed increase of lead in the water, and if SeaQuest is needed, an orthophosphate should be added to reduce the lead release in the water, and whether Aqua ignored those warnings;

(28)     whether, at the time Aqua issued the Do Not Consume, Aqua did not know what was causing the elevated lead levels or how widespread it was throughout University Park;

(29)     whether, at the time Aqua issued the Do Not Consume, Aqua could not assure that the finished water coming out of every University Park consumer's tap was safe to consume;

50

(30)     whether Aqua undertook any type of corrosion control study to investigate the cause of the elevated lead levels in the May 2019 water testing;

(31)     whether, at the time Aqua created the Lead Advisory Area, Aqua could not assure that the finished water coming out of the University Park consumers' taps in the Lead Advisory Area was safe to consume;

(32)     whether, in homes throughout the Do Not Consume and Lead Advisory Area, it was occurring that the tap water lead levels would fluctuate between normal and elevated levels within each home, and from one home to the next;

(33)     whether it was reasonable for customers in University Park who were subject to the Do Not Consume and Lead Advisory Area to think that their water may not be safe to drink out of the tap;

(34)     whether there is any level of lead in drinking water that is safe to consume;

(35)     whether Aqua could not assure that the finished water coming out of every University Park consumer's tap was safe to consume for all consumers subject to the Do Not Consume and/or Lead Advisory Area;

(36)     whether it was appropriate for University Park residents to follow Aqua's guidance in the Do Not Consume and Lead Advisory Area, and abstain from using/consuming their tap water;

(37)     whether the Do Not Consume and Lead Advisory Area encompassed more limitations than simply not drinking the tap water;

(38)     whether all residents who were under the Do Not Consume or in the Lead Advisory Area may have experienced disruptions in their lives, regardless of whether they had their tap water tested for lead;

(39)     whether University Park residents' damages result from Aqua's inability to assure the tap water was safe to consume in homes throughout the Village (including homes in the Lead Advisory Area constructed after 1990), regardless of whether a household had an elevated lead test, and even if they did not drink the tap water prior to the Do Not Consume;

(40)     whether Aqua had a duty to assure that the finished water coming out of every University Park consumer's tap was safe to consume;

(41)     whether Aqua breached its duty to assure that the finished water coming out of every University Park consumer's tap was safe to consume for the households subject to the Do Not Consume and/or Lead Advisory Area;

51

(42)     whether Aqua caused water that was not assuredly safe to enter Plaintiffs' and Class members' land through a negligent act;

(43)     whether Aqua caused water that was not assuredly safe to invade Plaintiffs' and Class members' interest in the use and enjoyment of their land;

(44)     whether, and to what extent, Plaintiffs and Class members incurred "costs of response" in connection with Aqua's contamination of the Village's water supply, as contemplated by CERCLA;

(45)     whether it was a regular practice for Aqua to put water pipelines into service without an operating permit;

(46)     whether it was a regular practice for Aqua to add chemicals to municipal public water supplies without an operating permit;

(47)     whether it was a regular practice for Aqua to put construction projects into service without an operating permit, and whether the IEPA issued violation notices to Aqua for that conduct;

(48)     whether Aqua intentionally violated an EPA regulation by secretly informing University Park compliance testing consumers to flush the water lines in their homes prior to collecting the water samples, in an effort to artificially lower the lead test results in 2020;

(49)     whether Aqua pumped polluted (not potable) water from the Kankakee Water Treatment Plant into the Kankakee River every day from 2018 (prior to the Do Not Consume) to 2020 without a permit, and whether that constitutes an ongoing illegal discharge of polluted water into the Kankakee River;

(50)     whether, in January 2024, the IEPA issued a violation notice to Aqua for providing public drinking water that Aqua could not assure was safe to consume due to Aqua's failure to properly treat the water;

(51)     whether Aqua acted willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others;

(52)     whether Aqua inflicted a highly unreasonable risk of harm upon its customers in conscious disregard of the risk;

(53)     whether Aqua had knowledge of the impending danger of the release of lead into University Park water, and whether Aqua failed to exercise ordinary care to prevent the danger; and

(54)     whether Aqua has a pattern and practice of engaging in misconduct and violating the law.

52

**B.    Classwide Damages and Relief**

192.    Under the circumstances described above, it was reasonable for Plaintiffs and all Class members who were under a "do not consume" or "lead advisory," *regardless* of whether they had their tap water tested for lead, to take the following measures to protect themselves from the potential and threat of elevated lead in their tap water, and experience the following disruptions in their lives:

(a)    Using bottled or filtered water for drinking, cooking food, washing dishes, and making ice;

(b)    Using bottled or filtered water to wash their face, brush their teeth, or bathe themselves;

(c)    Using bottled water to water their vegetable garden or wash their vegetables, if they were going to eat those vegetables;

(d)    Spending time driving to pick up, or waiting to pick up, bottled water or filters;

(e)    Having difficulty carrying bottled water;

(f)    Spending time replacing filters in faucets or pitchers;

(g)    Spending time reviewing news reports, notifications, or community updates regarding the water quality issues;

(h)    Spending time attending or watching public meetings regarding the water quality issues;

(i)    Being concerned about, or spending time researching, health effects related to the water quality issues;

(j)    Seeking medical care or testing regarding the water quality issues for themselves, loved ones, or pets; and

(k)    Enduring stress, annoyance, discomfort, or inconvenience, or not being able to fully use and enjoy their residence or business.

193.    Plaintiffs and all Class members who were under a "do not consume" or "lead advisory," suffered the following damages:

(a)    Expending out-of-pocket costs for bottled water, filters for water pitchers,

53

filtration systems, medical bills, temporary lodging, and other expenses;

(b)     Loss of time;

(c)     Loss of income;

(d)     The presence and potential for elevated levels of lead in the drinking water supply throughout the Village has threatened the health of Plaintiffs and Class members, and exposes them to injury and the fear of future injury, including the risk of increased and irreversible health impacts, especially to young children; and

(e)     The lives of Plaintiffs and Class members have been disrupted on a daily basis, causing considerable stress, aggravation, annoyance, inconvenience, and discomfort.

## VII.    CAUSES OF ACTION

### <u>COUNT I</u>
**(CERCLA Cost Recovery)**

194.    Plaintiffs, individually, and on behalf of the Class defined herein, repeat, reallege and incorporate by reference paragraphs 1 through 193 as paragraph 194 of this Count I, as though fully set forth herein.

195.    As previously discussed, "CERCLA liability attaches when a plaintiff establishes that: (1) the site in question is a 'facility' as defined by CERCLA; (2) the defendant is a responsible party; (3) there has been a release or there is a threatened release of hazardous substances; and (4) the plaintiff has incurred costs in response to the release or threatened release." *E.g.*, *Sycamore Indus.*, 546 F.3d at 850.

196.    Each Plaintiff and Class member, as well as Defendant, is a "person" as defined by CERCLA. 42 U.S.C. § 9601(21)

197.    The Public Water System is a "facility," as that term is defined by CERCLA, and as the owner and operator of the Public Water System, Aqua is a responsible party. *E.g.*, 42 U.S.C. § 9601(9); 42 U.S.C. § 9607(a)(1).

54

198.     Lead is a "hazardous substance," as that term is defined by CERCLA.  42 U.S.C. § 9601(14); 40 C.F.R. § 302.4.

199.     As set forth above, the leaching of lead (or threatened leaching of lead) into the tap water in Plaintiffs' and Class members' homes constituted a "release" or threatened "release" of a "hazardous substance," as those terms are defined by CERCLA. *E.g.*, 42 U.S.C. § 9601(7); 42 U.S.C. § 9601(8); 42 U.S.C. § 9601(14); 42 U.S.C. § 9601(22); 40 C.F.R. § 302.4.

200.     Plaintiffs and Class members incurred costs in connection with the "removal" of lead (*i.e.*, a "released" "hazardous substance") from the tap water in their homes (*i.e.*, "the environment"). *E.g.*, 42 U.S.C. § 9601(7); 42 U.S.C. § 9601(8); 42 U.S.C. § 9601(14); 42 U.S.C. § 9601(22); 42 U.S.C. § 9601(23); 42 U.S.C. § 9601(25); 40 C.F.R. § 302.4. These "costs of response" include, but are not limited to, those associated with (1) purchasing bottled water or other alternative water supplies to replace the unusable tap water in their homes, (2) purchasing filters and other devices to extract lead from their tap water, (3) seeking medical testing to assess the effect of the lead contamination on their health, or the health of their family members and pets, or to identify any health problems resulting from their potential consumption of lead, and (4) testing, researching, and gathering information regarding the water quality in their homes, as well as the scope, degree, and extent of the lead contamination at issue.

201.     Pursuant to 42 U.S.C. § 9607(a)(1)(B), Plaintiffs and the Class are entitled to full reimbursement from Defendant for all of the aforementioned "costs of response" that they incurred as a result of Defendant's lead contamination.

## COUNT II
### (Nuisance)

202.     Plaintiffs, individually, and on behalf of the Class defined herein, repeat, reallege and incorporate by reference paragraphs 1 through 193 as paragraph 202 of this Count II, as though fully set forth herein.

203.     A public nuisance is defined as the "doing of or the failure to do something that injuriously affects the safety, health or morals of the public, or works some substantial annoyance, inconvenience or injury to the public." *E.g.*, *Burns v. Simon Properties Group, LLP*, 2013 IL App (5th) 120325, ¶ 6.   In contrast, "a private nuisance is a substantial invasion of another's interest in the use and enjoyment of his or her land." *E.g.*, *Dobbs v. Wiggins*, 401 Ill.App.3d 367, 375 (5th Dist. 2010).   "A private nuisance, however, that interferes with public rights can also constitute a public nuisance." *Chicago Nat. League Ball Club, Inc. v. Thompson*, 108 Ill. 2d 357, 365 (1985); *City of Chicago v. Am. Cyanamid Co.*, 355 Ill.App.3d 209, 215 (1st Dist. 2005).

204.     Aqua's actions and inactions constitute both public and private nuisance, as (1) Plaintiffs' and Class members' right to access the Public Water Supply is a public right because the Public Water Supply is an indivisible resource shared by the public at large, and (2) Plaintiffs' and Class members' ability to use and consume water from the Public Water Supply is crucial to their use and enjoyment of their property. *See, e.g.*, *City of Chicago*, 355 Ill.App.3d at 214-15.

205.     Aqua's actions and inactions resulted in the Public Water Supply to not be "assuredly safe" in quality for ordinary domestic consumption. Aqua's actions and inactions injuriously affect the safety and health of the public, and cause substantial annoyance, inconvenience, and injury to the public, including Plaintiffs and Class members.

206.     Aqua's actions and inactions resulted in lead leaching into the water, and the threat and uncertainty of lead leaching into the water, it sold and supplied to Plaintiffs and Class members and interfered with their use and enjoyment of their properties. For example, pursuant to Aqua's "do not consume" notice to Plaintiffs and Class members, Plaintiffs and Class members could not drink or even brush their teeth with their tap water. And Aqua could not

assure that the water was safe to consume for all Plaintiffs and Class members subject to the "lead advisory."

207.    Aqua knew or should have known that its actions and inactions described herein would substantially interfere with Plaintiffs' and Class members' reasonable use and enjoyment of their properties, and Aqua recklessly, willfully, and intentionally acted in contravention of the known risks; thus, rendering an award of punitive damages appropriate.

208.    As alleged above, Plaintiffs and Class members have incurred substantial damage as a result of Aqua's actions and inactions constituting a nuisance.

## COUNT III
### (Negligence)

209.    Plaintiffs, individually, and on behalf of the Class defined herein, repeat, reallege and incorporate by reference paragraphs 1 through 193 as paragraph 209 of this Count III, as though fully set forth herein.

210.    The Village's Public Water System and the Public Water Supply was in the exclusive control of Aqua.

211.    Pursuant to the Act, Aqua owed a duty to Plaintiffs and Class members to provide water to them that is assuredly safe and would not cause, or threaten to cause, lead to leach into their water.

212.    Aqua breached its duty to Plaintiffs and Class members by its actions and inactions described herein that allowed lead to leach into, or threaten to leach into, Plaintiffs' and Class members' water.

213.    If ordinary care was used, the lead would not have leached into Plaintiffs' and Class members' water, and there would not have been a threat that lead would leach into Plaintiffs' and Class members' water.

214.    Aqua also had a duty to promptly warn Plaintiffs and Class members of the leaching of lead or potential for leaching of lead into their water, and to promptly and effectively address and prevent the leaching of lead into the Public Water Supply.

215.    The August 2018 residential tap water testing was the <u>first</u> time that lead testing was performed on the water in University Park after the source water switch to Kankakee River water in December 2017. The results of the August 2018 water testing showed that the tap water lead results had a 90th percentile that exceeded the 15 ppb EPA lead action level. This water testing showed lead detections in homes above 15 ppb for the ***first time in the history*** of water sampling in University Park.

216.    Because the August 2018 water lead results exceeded the EPA lead action level, Chapter 4 of the Lead and Copper Rule required Aqua to provide written notice of the elevated lead to each of the University Park customers. However, in violation of this Lead and Copper Rule requirement, Aqua did not provide the required written notice of the elevated lead to the University Park customers. Instead, Aqua collected one additional water sample to "dilute" the test results and bring the 90th percentile to **0.1 ppb below** the 15 ppb EPA lead action level, and Aqua stopped testing after collecting that one sample.

217.    The U.S. EPA required Aqua to admit that it could not ensure the quality of the University Park drinking water from July – December 2018, due to Aqua's sampling misconduct in the August 2018 lead testing.

218.    However, Aqua never informed University Park customers of the elevated lead in their tap water until June 14, 2019, which was after the <u>second</u> round of lead testing conducted in University Park after the source water switch to Kankakee River water.

219.    Moreover, Aqua performed no additional water or lead testing to investigate the cause of the elevated lead test results in the August 2018 water testing. Aqua failed to perform a

corrosion control study for the University Park public water system in response to the results of the August 2018 water testing.

220.    Aqua did nothing to investigate the source of the elevated lead levels in University Park tap water following the August 2018 testing, which showed elevated lead for the first time in the history of the village.

221.    It was foreseeable that Aqua's actions and inactions as described herein would result in the leaching of lead or potential for leaching of lead into Plaintiffs' and Class members' water and supplying them with water that was not assuredly safe.

222.    As a direct and proximate result of Aqua's actions and inactions, Plaintiffs and Class members have been damaged, as described above.

<u>**COUNT IV**</u>
**(Trespass)**

223.    Plaintiffs, individually, and on behalf of the Class defined herein, repeat, reallege and incorporate by reference paragraphs 1 through 193 as paragraph 223 of this Count IV, as though fully set forth herein.

224.    Plaintiffs and Class members reside/resided, or own/owned property, in the Village during the Class Period and obtain/obtained water in their homes or properties from the Public Water System owned and operated by Aqua.

225.    Aqua intentionally discharged SeaQuest into the drinking water supply throughout the Village, which altered the properties of the drinking water supply throughout the Village. This altered drinking water, including SeaQuest, flowed onto the properties of Plaintiffs and Class members.

226.    Plaintiffs and Class members did not consent to or permit the flow of SeaQuest or the altered drinking water onto their properties because of the risk that it (i) would allow or tend to allow elevated levels of lead to be deposited into their tap water, and (ii) would create or

59

would be likely to create a nuisance or render or threaten to render the drinking water supply harmful or detrimental or injurious to public health, safety, or welfare.

227.    As a direct and proximate result of Aqua's conduct, altered drinking water, including SeaQuest, flowed onto the properties of Plaintiffs and Class members, which (i) allowed or tended to allow, or created a potential or threat that it would allow or tend to allow, elevated levels of lead to be deposited into their tap water, and (ii) created or likely created a nuisance and rendered or threatened to render the drinking water supply harmful or detrimental or injurious to public health, safety, or welfare.

228.    Aqua's trespasses onto Plaintiffs' and Class members' drinking water supply in their homes and properties were intentional, willful and wanton, and/or negligent, and wrongful; thus, rendering an award of punitive damages appropriate.

229.    Aqua's trespasses onto Plaintiffs' and Class members' drinking water supply in their homes and properties disrupted the lives of Plaintiffs and Class members, causing considerable stress, aggravation, annoyance, inconvenience, and discomfort, and interfered with Plaintiffs' and Class members' reasonable use and enjoyment of their properties.

230.    As a direct and proximate result of Aqua's actions and inactions, Plaintiffs and Class members have been damaged, as described above.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment in favor of Plaintiffs and the Class and against Defendant, and pray that the Court:

A.    Certify this action as a Class action on behalf of the Class defined herein, appoint Plaintiffs as the Class representatives, and appoint Plaintiffs' counsel as counsel for the Class;

B.    Enter judgment in favor of Plaintiffs and the Class, and against Defendant;

60

C.  Award Plaintiffs and the Class members all response costs incurred in connection with Defendant's lead contamination, as contemplated by CERCLA;

D.  Award nominal and punitive damages, and actual damages incurred by Plaintiffs and the Class for all out-of-pocket costs, loss of time, loss of income, injury and fear of future injury, and stress, aggravation, annoyance, inconvenience, and discomfort;

E.  Award Plaintiffs and the Class their attorney's fees and costs of suit, and such other and further relief as the Court deems just and proper.

## IX.  JURY DEMAND

Plaintiffs demand a trial by jury on all counts so triable.

Plaintiffs Rozita Arnold, Patsy Banks, Adrienne Baugh, Phoebe Beamon, Alicia Benavides, Setian Bey, Rochelle Blocker, Glori Bond, Kari Boykin, Eddie Bradley, Jennifer Branigan, Louis Brooks, Isheona Brown, Shirley Brown, Stephanie Brown, Dolores Buckley, Leroy Burton, Victor Burton, Joyce Calvin-Harmon, Endella Cole, Jacqueline Coleman, Vivian Covington, Lonzell Cross, Christopher Cruz, Leneka Davis, Lorenzo Davis, Ronald Davis, Shavon Davis, Latasha Downing, Diane Doyle, Erica Duncan, Sharon Elliott, Tommie Galloway, Otis Gardner, Todd Gardner, Christopher Graham, Leshem Graham, Elaine Green, Roosevelt Hall, Robert Hawkins, Lydia Henry, Dorothy Hickman, Roger Hickman, Eric Hirsch Jr., Anthony Hudson, Louvon Zelor Humphries, James Jackson, Veta Jackson, Shirley Jackson-Gordon, Zakia Jarrett, Andre Johnson, Charlene Johnson, Crystal Johnson, Dwayne Johnson, Clarence Jones, Irene Jones, Marjorie Jones, Darlissa Jordan, Joseph Lewis, Jennifer Madden, Wilton Martin, Sade McFadden, Yvette Mells, Michael Merrill, Cara Meyers, Deidre Meyers, Carmelita Moore, Mike Ogbara, Deborah Orr, Porchia Pelt, Lolita Perkins, Lisa Plummerel, Henry Porter, Kelly Rembert, Shirley Rivers, Natasha Roberson, James Roberson, Phyllis Saunders, Peggy Sims, Michelle Smith-Williams, George Snyder, Jimmy Sorrell, Hester Spurlock, Laquesha Stephenson, Sylvia Stevens, LaTanya Stewart, John Turner, Tanika Vercher, Robin Walker, Phyllis Warren, Ernestine Watson, Mary White, Cleo Wilder, Gina Williams, Johnny Williams, Marquita Willis, Gregory Wooding, and Sharon Wynn, individually, and on behalf of all others similarly situated,

61

By:   */s/ Thomas A. Zimmerman, Jr.*

      Thomas A. Zimmerman, Jr.  (IL #6231944)
      *tom@attorneyzim.com*
      Sharon A. Harris
      *sharon@attorneyzim.com*
      Matthew C. De Re
      *matt@attorneyzim.com*
      Jeffrey D. Blake
      *jeff@attorneyzim.com*
      **ZIMMERMAN LAW OFFICES, P.C.**
      77 W. Washington Street, Suite 1220
      Chicago, Illinois 60602
      (312) 440-0020 telephone
      (312) 440-4180 facsimile
      www.attorneyzim.com

Counsel for the Plaintiffs and Class