UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROZITA ARNOLD, et al.,

        Plaintiffs,

      v.

AQUA ILLINOIS, INC.,

        Defendant.

No. 25 CV 2522

Judge Georgia N. Alexakis

MEMORANDUM OPINION AND ORDER

Rozita Arnold and numerous other residents of the Village of University Park, Illinois ("plaintiffs") are suing Aqua Illinois, Inc., the operator of University Park's public water system, to recoup costs they incurred in response to the alleged detection of lead in some University Park homes' tap water. They bring claims under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 et seq., as well as several state-law claims. Aqua now moves to dismiss their complaint for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, the motion to dismiss is granted.

## I.    Legal Standard

A complaint must contain "a short and plain statement showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion, the complaint need only "state a claim to relief that is plausible

on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

At this stage, the Court assumes that the facts alleged in the complaint are true and draws all reasonable inferences from those facts in the plaintiffs' favor. *See Tobey v. Chibucos*, 890 F.3d 634, 645 (7th Cir. 2018). But the factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Alleged facts that are "'merely consistent with' a defendant's liability" fall short of the plausibility standard. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Further, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Similarly, a complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" will not survive a motion to dismiss. *Id.*

## II. Allegations

Plaintiffs are current and former residents of the Village of University Park, Illinois. [1] ¶ 3. They allege that Aqua, which owns and operates University Park's Public Water System, *id.* ¶ 170, began adding a chemical called SeaQuest to University Park wells, *id.* ¶ 14, to control the buildup of calcium carbonate inside pipes throughout University Park, *id.* ¶ 16. When Aqua began sourcing its water from the Kankakee River, it continued its use of SeaQuest. *Id.* ¶ 17.

About eight months after Aqua began using Kankakee River water, residential tap water testing revealed elevated lead levels in the tap water of some University Park homes. *Id.* ¶¶ 44–45. Additional testing about nine months later revealed elevated lead levels in more than 10% of tap-water samples. *Id.* ¶ 60. Aqua soon issued a Do Not Consume notice to the whole University Park service area, which comprised 2,124 unique premises. *Id.* ¶ 61. Aqua did not know what was causing the elevated lead levels, *id.* ¶ 62, but it stopped adding SeaQuest to the water system one day after it issued the Do Not Consume notice, *id.* ¶ 67.

Aqua eventually determined that SeaQuest was likely causing the elevated lead levels. *Id.* ¶ 72. Kankakee River water is softer than the well water that Aqua previously used, so when Aqua began using Kankakee River water, it no longer needed to add SeaQuest to control mineral buildup. *Id.* ¶¶ 28, 30. The unnecessary SeaQuest instead had a negative effect, eroding the protective calcium carbonate coating inside the pipes of University Park homes. *Id.* ¶ 72. Without the protective coating, lead in the homes' interior plumbing was exposed and leached into the homes' tap water. *Id.* ¶ 73.

Six weeks after the issuing the Do Not Consume notice, Aqua lifted the notice and replaced it with a Lead Advisory Area, *id.* ¶ 79, which was an area comprising 1,634 premises that were suspected to have lead issues, *id.* ¶¶ 80, 82. Of those premises, 183 were homes constructed after 1990. *Id.* ¶ 83. From the Lead Advisory Area's implementation date in July 2019 through April 28, 2023—approximately four

years—811 residential tap-water samples tested positive for elevated lead levels. *Id.* ¶ 88. Some of those samples were from homes constructed after 1990. *Id.* ¶ 94.

Plaintiffs incurred several costs in responding to the release or threatened release of lead into their tap water, including the cost of bottled water, water filters, medical testing, and water quality testing. *Id.* ¶ 200. They seek to recoup those costs from Aqua under section 107 of CERCLA, 42 U.S.C. § 9607(a)(4)(B), *id.* ¶ 201, in addition to bringing multiple state-law claims.

## III. Analysis

### A. CERCLA Claim

CERCLA has a twofold purpose: "to 'promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination.'" *Von Duprin LLC v. Major Holdings, LLC*, 12 F.4th 751, 758 (7th Cir. 2021) (quoting *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009)). Section 107 of CERCLA provides that "the owner and operator of a … facility … from which there is a release, or a threatened release … , of a hazardous substance, shall be liable for … any … necessary costs of response incurred by any … person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). It thus allows private parties to recover the cost of "clean[ing] up hazardous materials that [another] party spilled onto its property or that migrated there from adjacent lands." *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 784 (7th Cir. 2000) (quoting *Azko Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 764 (7th Cir. 1994)).

4

To state a claim for cost recovery under section 107(a) of CERCLA, a plaintiff must plausibly allege that (1) the site in question is a "facility"; (2) the defendant is an owner or operator of the facility or another covered person under section 107(a); (3) there was a "release" (or threatened release) of a "hazardous substance"; and (4) the plaintiff incurred costs in response to the release. *See Sycamore Indus. Park. Assocs. v. Ericsson, Inc.*, 546 F.3d 847, 850 (7th Cir. 2008); *Cont'l Paper Grading Co. v. Nat'l R.R. Passenger Corp.*, No. 21-cv-224, 2021 WL 5299772, at *1 (N.D. Ill. Nov. 15, 2021).

As explained below, plaintiffs' complaint fails to state a claim under section 107(a) because it does not plausibly allege that there was a "release" of a hazardous substance from a "facility."

## 1.    A "release" of a hazardous substance from a "facility"

CERCLA defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing *into the environment*." 42 U.S.C. § 9601(22) (emphasis added). Plaintiffs allege that lead (which CERCLA defines as a hazardous substance, *see* 42 U.S.C. § 9601(14), 9602; 40 C.F.R. § 302.4) was detected in the tap water of certain homes in University Park, *see* [1] ¶¶ 45, 60, 84, 88, 92,  and the lead allegedly leached into the tap water from the homes' internal plumbing because Aqua added SeaQuest to the University Park water supply, *id.* ¶¶ 16, 72–74. According to Aqua, this does not amount to a "release" of lead because a home's internal plumbing and its tap water are not an "environment" as CERCLA defines that word. [32-1] at 14.

5

Identifying the relevant definition of "environment" involves a statutory goose chase. CERCLA's definition includes "any … surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air." 42 U.S.C. § 9601(8). A "drinking water supply" is "any raw or finished water source that is or may be used by a public water system" as defined in the Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.* 42 U.S.C. § 9601(7). The Safe Drinking Water Act in turn defines "public water system" as "a system for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has at least fifteen service connections or regularly serves at least twenty-five individuals." 42 U.S.C. § 300f(4)(A).

Aqua asserts that the "environment" does not include the interior of homes or other buildings. [32-1] at 14. Plaintiffs do not seem to contest this assertion, with which the Court agrees. The interior of a home is not "surface water, ground water, [a] drinking water supply, [a] land surface or subsurface strata, or ambient air." 42 U.S.C. § 9601(8). Nor are its pipes. *See Sycamore Indus. Park. Assocs.*, 546 F.3d at 853 (holding that there was no release or threatened release, within the meaning of CERCLA, because the hazardous substance was "contained inside the buildings of the facility or, in the instances when insulated piping runs between buildings, is enclosed in a piping chase or in a metal case"). And tap water within those pipes is not a "drinking water supply"; it is not used as a "water source" by the Public Water System. *See* 42 U.S.C. § 9601(7)–(8).

Instead of arguing that tap water within their homes constitutes the "environment," as their complaint alleges, [1] ¶ 200, plaintiffs argue that their complaint "only needs to show that a hazardous substance '*may* have entered the environment,'" [39] at 12 (emphasis in the original) (cleaned up) (quoting *Barclay Lofts LLC v. PPG Indus., Inc.*, No. 20-CV-1694, 2024 WL 4224731, at *10 (E.D. Wis. Sep. 18, 2024) ("*Barclay II*")). In other words, according to plaintiffs, CERCLA liability is only avoided "where 'there is no real possibility that a hazardous substance could enter the environment.'" *Id.* (cleaned up) (quoting *Barclay II*, 2024 WL 4224731, at *9).

But a "mere possibility" that a hazardous substance entered the environment is not enough to show "that [plaintiffs] [are] entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Although the complaint need not allege facts explaining *how* contaminated water made (or threatened to make) its way from a building's interior into the environment, it still must allege facts supporting a reasonable inference that the contaminated water *did* make (or threaten to make) its way into the environment. *See* 42 U.S.C. §§ 9607(a)(4), 9601(22); *cf. Premium Plastics v. LaSalle Nat. Bank*, 904 F. Supp. 809, 813–14 (N.D. Ill. 1995) (collecting cases and denying defendant's motion for summary judgment because plaintiff presented circumstantial evidence that an interior chemical spill contaminated the surrounding environment).

*Barclay II*, 2024 WL 4224731, which plaintiffs quote in support of their argument, [39] at 12, is not persuasive. The quoted language from that case—"[t]he

plain language of the statute … states that the disposal must be such that hazardous waste *may* enter the environment, not that it *did* enter the environment," 2024 WL 4224731, at *10—comes from its discussion of whether the defendant was a "responsible person" under section 107(a)(2). That question depended on CERCLA's definition of the word "disposal." *Id.* at *9 (discussing 42 U.S.C. § 9607(a)(2)). Incorporating a definition from another statute, CERCLA defines "disposal" as "the discharge … of any … hazardous waste … so that such … hazardous waste … may enter the environment." *See* 42 U.S.C. § 9601(29) (incorporating 42 U.S.C. 6903(3)).

The quoted language from *Barclay II*, then, comes directly from the statutory definition of "disposal," which is not at all relevant to the question of whether plaintiffs have plausibly alleged that there was a "release" or threatened "release." A "release" must be "into the environment." 42 U.S.C. § 9601(22). The definition of "release," unlike the definition of "disposal," does not contain a permissive modal verb like "may" that allows for the mere possibility of entry into the environment.[1] *Compare id. with* 42 U.S.C. § 6903(3). Indeed, in *Barclay II*, there was no question that there had been a release "into the environment." The parties had stipulated that the soil, soil vapor, and groundwater were contaminated with various hazardous substances. 2024 WL 4224731, at *11.

---

[1] Although section 107(a)(4) provides for liability where there has been a "threatened release," a threat of release is not the same as a mere possibility. *See Powell Duffryn Terminals, Inc. v. CJR Processing, Inc.*, 808 F. Supp. 652, 656 (N.D. Ill. 1992) (holding that there was no threat of release when a defendant who was ill-equipped to handle waste nevertheless received waste and failed to take necessary precautions, because those facts did not tend to show "a concrete threat of release").

Plaintiffs also quote *Barclay II*'s assertion that "every court that has addressed this issue … has held that it is not necessary to prove actual contamination of plaintiff's property by defendant's waste," [39] at 12 (quoting *Barclay II*, 2024 WL 4224731, at *10), but they draw the wrong lesson from that language. The defendant in *Barclay II* argued that it should escape CERCLA liability because the plaintiff had not shown that the defendant had caused the release that drove plaintiffs' remediation costs. 2024 WL 4224731, at *10. The court rejected that argument, holding that, "once the requisite connection between the defendant and a hazardous waste site has been established (because the defendant fits into one of the four categories of responsible parties), it is enough that response costs resulted from 'a' release or threatened release—not necessarily the defendant's release or threatened release." *Id.* (quoting *United States v. Hercules, Inc.*, 247 F.3d 706, 716 (8th Cir. 2001)). This context shows that the key words in the *Barclay II* language that plaintiffs quote are "by defendant's waste," not, as plaintiffs appear to believe, "actual contamination." Thus, the quote's lesson is simply that causation is not part of the statutory definition of "release"; it doesn't change the fact that entry "into the environment" is. 42 U.S.C. § 9601(22).

Plaintiffs' other two cases are inapposite. In *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146 (1st Cir. 1989), and *City of Aurora v. Get Green Recycling Inc.*, No. 23 C 3187, 2024 WL 98381 (N.D. Ill. Jan. 9, 2024), the courts each held that CERCLA liability does not require "off-site migration of hazardous substances" or "migration of hazardous substances toward the contribution

claimant's site." *City of Aurora*, 2024 WL 98381, at *8; *see Dedham Water Co.*, 889 F.2d at 1154. But *Dedham's* holding concerns principles of causation, and both cases stand for the proposition that CERCLA liability does not require a plaintiff to allege that a release had reached or would reach the plaintiff's property. Neither case changes the fact that that a "release" must be "into the environment." 42 U.S.C. § 9601(22).

Aqua also argues that the complaint fails to allege that any release of a hazardous substance was from its "facility." [32-1] at 14–16. The Court agrees. To be liable for cost recovery under section 107 of CERCLA, the site in question must be a "facility," and the defendant must be an owner or operator of the facility or another covered person under section 107(a). *See Cont'l Paper Grading Co.*, 2021 WL 5299772, at *1. The only "facility" that the complaint alleges to be owned or operated by Aqua is the Public Water System. *See* [32-1] at 14; [1] ¶¶ 169–70. And Aqua points out that the only substance that was allegedly released from the Public Water System is SeaQuest, which is not a "hazardous substance" under CERCLA. [32-1] at 14. That release then allegedly caused lead from "the internal plumbing of homes"—not from the System—to "dissolve[] into the water of certain homes in University Park." [1] ¶ 70. A release from homes' internal plumbing is not one for which Aqua can be liable under CERCLA, since Aqua is not "the owner [or] operator" of those homes or their internal plumbing. 42 U.S.C. § 9607(a)(1).

Plaintiffs try to avoid Aqua's arguments—that the complaint plausibly alleges neither a release of a hazardous substance "into the environment," [32-1] at 13–14,

nor a release of a hazardous substance from a "facility," [32-1] at 14–16—by abandoning the theory asserted in their complaint: that "the leaching of lead (or threatened leaching of lead) into the tap water in Plaintiffs' and Class members' homes constituted a 'release' or threatened 'release' of a 'hazardous substance,' as those terms are defined by CERCLA." [1] ¶ 176; *see also id.* ¶ 179. They instead argue that the complaint's factual allegations "establish that lead spread *beyond* the confines of individual properties, circulated throughout the entire Public Water System, and was 'released' from the Public Water System itself." [39] at 10. In other words, plaintiffs argue that the complaint's alleged facts support a reasonable inference that lead-contaminated water migrated cyclically between homes' internal plumbing (where it originated) and the Public Water System. Assuming that the Public Water System constitutes the "environment," as plaintiffs argue, [39] at 10 n.3, and also constitutes a "facility," as plaintiffs allege, [1] ¶ 169, such a cyclic migration would amount to a "release" of a "hazardous substance" from a "facility" as required for liability under section 107(a), 42 U.S.C. 9607(a).

The problem is that the complaint's alleged facts do not reasonably support that inference. Plaintiffs ask the Court to infer the cyclic migration theory from a handful of allegations: First, out of 1,634 premises included in the Lead Advisory Area (an area encompassing the premises that "had the potential for exposure to lead," [1] ¶ 81), 183 were constructed after 1990. [1] ¶¶ 82–83, 107. Second, "[t]here were homes constructed after 1990" that showed elevated lead levels when tested. *Id.* ¶ 94. According to plaintiffs, these allegations necessarily mean that lead-

contaminated water migrated into the Public Water System. [39] at 11. This is because, according to plaintiffs, "federal law has prohibited the use, installation, or repair of lead plumbing fixtures and solder since June 19, 1986." *Id.* (citing 42 U.S.C. § 300g-6(a)(1)(A)).[2]

But that isn't true. The version of the Safe Drinking Water Act (the statute that plaintiffs cite in support of their argument) that was in effect in 1990 limited (but did not prohibit) lead in pipes, pipe fittings, solder, and flux. It declared that "[a]ny pipe, solder, or flux" used "in the installation or repair of … any plumbing in a residential or nonresidential facility providing water for human consumption which is connected to a public water system shall be lead free (within the meaning of subsection (d)." Safe Drinking Water Act Amendments of 1986, Pub. L. No. 99-339, sec. 109, § 1417(a)(1), 100 Stat. 651. It then defined "pipes and pipe fittings" as "lead free" if they contained "not more than 8.0% lead," and "solder and flux" as "lead free" if they contained "not more than 0.2 percent lead." *Id.* at § 1417(d), 100 Stat. 652. A 2011 amendment to the Act further reduced the permissible lead content in "pipes" and "pipe fittings"—and also, unlike the 1986 amendments, "plumbing fittings and fixtures"—from 8% to 0.25%. *See* Reduction of Lead in Drinking Water Act, Pub. L. No. 111-380, Sec. 2(a)(2), 124 Stat. 4131.

So, to infer plaintiffs' cyclic migration theory from the facts alleged in their complaint, the Court would have to assume not only that all houses built after 1990

---

[2] This assertion is not entitled to a presumption of truth. It is an argument in a brief, not an allegation in the complaint. And even if it were in the complaint, it is a legal conclusion, not a "well-pleaded factual allegation." *Iqbal*, 556 U.S. at 664.

12

were fully compliant with the Safe Drinking Water Act Amendments of 1986 but also that a home's plumbing system cannot leach lead into the home's tap water if its pipes and pipe fittings (but not necessarily its "plumbing fittings" and "fixtures") are no more than 8% lead, and its solder and flux are no more than 0.2% lead. Even then, it would remain a mystery how lead-contaminated water from older homes' tap water would have migrated back into the Public Water System. To be clear, the complaint does not allege that lead was found anywhere other than some properties' tap water. [1] ¶¶ 45, 60, 84, 88, 92. It does not allege that lead was detected in any soil, surface water, ground water, or the Public Water System itself.

The inferences and assumptions needed to bridge the gap between the complaint's factual allegations and plaintiffs' cyclic migration theory are not reasonable. The alleged facts may be "consistent with" Aqua's liability. *Iqbal*, 556 U.S. at 678. But even so, the complaint "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Plaintiffs have not plausibly alleged that there was a "release or threatened release" of a "hazardous substance" from a "facility." 42 U.S.C. § 9607(a)(4)(B).

* * *

These deficiencies are enough to sink Aqua's CERCLA claim. But, because the Court will provide plaintiffs an opportunity to amend their CERCLA claim, *see infra* section III.B, it briefly addresses Aqua's other arguments for why plaintiffs' CERCLA claim should fail.

13

### 2. Plaintiffs' Contribution to the Release

Aqua argues that plaintiffs' CERCLA claims should fail because the complaint does not show that "the plaintiff 'did not pollute the site in any way,'" *NutraSweet*, 227 F.3d at 784 (quoting *Rumpke of Ind., Inc. v. Cummins Engine Co., Inc.*, 107 F.3d 1235, 1241 (7th Cir. 1997)), which, it contends, is a prima facie element of a section 107(a) cost-recovery claim. [32-1] at 12, 19–20. But the cases it cites are out of date; the Seventh Circuit has more recently held that even potentially liable persons may sue for cost recovery under section 107(a). *See Metro. Water Reclamation Dist. of Greater Chi. v. N. Am. Galvanizing & Coatings, Inc.*, 473 F.3d 824, 835 (7th Cir. 2007). Plaintiffs therefore need not plead that they did not contribute to the pollution in order to state a claim under section 107(a).

### 3. Necessity of Response Costs

Aqua argues that plaintiffs' CERCLA claims should fail because the complaint contains "no factual or even conclusory allegations that the[ir] 'response costs' were necessary" and in fact "demonstrates that those costs were *not* necessary." [32-1] at 16–17 (emphasis in the original). Although it is true that section 107(a)(4)(B) only provides for recovery of "necessary costs of response," 42 U.S.C. § 9607(a)(4)(B), it is not difficult to plausibly plead that requirement. *See Rolan v. Atl. Richfield Co.*, No. 1:16-CV-357-TLS, 2017 WL 3191791, at *8 (N.D. Ind. July 26, 2017) ("Plaintiffs are not required to set out a legal argument in their Complaint as to why these response costs were 'necessary' as a matter of law, only to put the Defendants on notice as to the nature of their claim."). For example, in *Metropolitan Water Reclamation District*, 473 F.3d at 835, the court held that the complaint's allegation that the plaintiff

14

incurred "'response' costs within the meaning of section 101(25) of CERCLA including investigation, monitoring and clean-up costs" was sufficient to plead that it had "incurred 'necessary costs of response.'" *Id.*

Here, the complaint alleges that plaintiffs incurred "costs of response" including "purchasing bottled water … , purchasing filters and other devices to extract lead from their tap water, … medical testing … , and … testing … the water quality in their homes." [1] ¶ 200. This allegation is more detailed than the allegation in *Metropolitan Water Reclamation District*, 473 F.3d at 835, and it puts Aqua "on notice as to the nature of [plaintiffs'] claim," *Rolan*, 2017 WL 3191791, at *8. The complaint therefore adequately pleads that plaintiffs incurred "necessary costs of response," 42 U.S.C. § 9607(a)(4)(B).

It does not matter that the complaint also alleges that Aqua provided bottled water to plaintiffs, investigated the contamination, provided filter devices, and offered customer-requested blood lead level testing to University Park residents. *See* [32-1] at 17 (citing [1] ¶¶ 82, 87–89, 92, 118, 131; [32-2] at 4–5). At this stage, the Court draws all reasonable inferences in plaintiffs' favor, *Tobey*, 890 F.3d at 645, and it is reasonable to infer that plaintiffs would not have incurred the alleged response costs unless Aqua's offerings were insufficient. *See Rolan*, 2017 WL 3191791, at *9 ("[T]he record must be developed before the Court can determine whether, as a matter of law, the Plaintiffs' investigative costs were duplicative or not.").

### 4. Consistency of Response Costs with the National Contingency Plan ("NCP")

Aqua argues that plaintiffs' CERCLA claims should fail because the complaint "do[es] not allege that [plaintiffs'] response costs were consistent with the NCP; nor do[es] [it] state any facts supporting such a proposition." [32-1] at 18. Plaintiffs contend that they are not required to plead that their alleged response costs were consistent with the NCP. [39] at 16. The Court agrees with plaintiffs.

Section 107(a)(4)(B) of CERCLA allows persons to recover "necessary costs of response … consistent with the national contingency plan." 42 U.S.C. 9607(a)(4)(B). Nevertheless, a plaintiff "does not have to plead facts to show that the costs it incurred were … consistent with the NCP" to state a claim under section 107(a)(4)(B). *Soo Line R.R. Co. v. Tang Indus., Inc.*, 998 F. Supp. 889, 895 (N.D. Ill. 1998). This makes sense, even following the clarification of Rule 8's notice-pleading standard in *Twombly*, 550 U.S. 544, and *Iqbal*, 556 U.S. 662. After all, the NCP's requirements are "numerous and task specific," *Von Duprin*, 12 F.4th at 770, so whether response costs were consistent with the NCP is a question that cannot be answered until the record has been sufficiently developed, *see Fitzgibbons v. City of Oswego*, No. 5:10-CV-1038, 2011 WL 6218208, at *9–*10 (N.D.N.Y. Dec. 13, 2011). Until then, the Court need not decide whether plaintiffs' alleged costs are of the kind that must comply with the NCP, *see, e.g.*, *LeClercq v. Lockformer Co.*, No. 00 C 7164, 2002 WL 907969, at *3 (N.D. Ill. May 6, 2002) (holding that certain preliminary response costs need not comply with the NCP), and, if they are, whether they do.

Aqua makes much of the fact that the complaints in the cases plaintiffs rely on do allege that response costs were consistent with the NCP. [46] at 13–14. But none of those allegations are the sort that matter when evaluating the adequacy of a complaint under Rule 8. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Each of the complaints identified by Aqua, however, contain only conclusory statements as to the alleged response costs' NCP compliance. [46-2] at 14, Complaint ¶ 152, *Barclay Lofts LLC v. PPG Indus., Inc.*, No. 2:20-CV-1694 (E.D. Wis. Nov. 10, 2020) ("The disposal and release of hazardous substances in connection with the Properties have caused and will continue to cause Barclay to incur necessary response costs consistent with the National Contingency Plan.").[3] If these conclusory allegations of NCP

---

[3] *See also* [46-5] at 6, Complaint ¶ 22, *CNH Am. LLC v. Champion Env't Servs. Inc.*, No. 09-CV-0999 (E.D. Wis. Mar. 15, 2010) ("The response actions taken by plaintiff and its Response Costs for those actions are reasonable and necessary, consistent with the National Contingency Plan … when required."); [46-6] at 6, Complaint ¶ 12, *Von Duprin LLC v. Moran Elec. Serv., Inc.*, No. 16-cv-1942 (S.D. Ind. Jul. 22, 2016) ("Von Duprin has incurred necessary costs of response that are consistent with the National Contingency Plan."); [46-7] at 11, 15, Complaint ¶¶ 52, 81, *City of Gary v. Shafer*, No. 2:07 CV 56 (N.D. Ind. Feb. 26, 2007) ("Releases of hazardous substances at the Property have caused the City to incur necessary costs, consistent with National Contingency Plan, in investigating and remediating lead, and other hazardous substances at the Property."); [46-8] at 16, Complaint ¶ 51, *LeClercq v. Lockformer Co.*, No. 00 C 7164 (N.D. Ill. Sep. 26, 2001) ("All such costs are necessary costs of response consistent with the National Contingency Plan."); [46-9] at 7, Complaint ¶ 27, *Cont'l Title Co. v. Peoples Gas Light and Coke Co.*, 96 C 3257 (N.D. Ill. May 31, 1999) ("The costs already incurred and to be incurred in the future by Continental Title, also a "person," as defined by 42 U.S.C. § 9601(21), were and are necessary costs of response incurred consistent with the National Contingency Plan, within the meaning of 42 U.S.C. § 9607(a)."); [46-10] at 10, Complaint ¶ 49, *Rochester Gas & Electric Corp. v. FirstEnergy Corp.*, No. 00 CV 6369 (W.D.N.Y. July 9, 2007) ("The response costs incurred by RO&E are consistent with the National Contingency Plan, which is codified at 40 C.F.R. Part 300."); *Soo Line R.R. Co.*, 998 F. Supp. at 895 ("In its amended complaint, plaintiff alleges that it has incurred and continues to incur "necessary" response costs "consistent with the NCP."); *Steward v. Honeywell Int'l, Inc.*, 469 F. Supp. 3d 872, 881 (S.D. Ill. 2020) ("Plaintiffs allege that

compliance are sufficient—and, according to the deciding courts, they are—then a plaintiff need not plead NCP compliance in order to state a claim for cost recovery under section 107(a). Plaintiffs' failure to allege legal conclusions like those, which would have no effect on the Court's analysis at this stage, cannot be the thing that sinks their section 107 claim.

The Court does agree with Aqua's point that section 107(a) only allows plaintiffs to recover costs that were "consistent with [NCP]," 42 U.S.C. § 9607(a)(4)(B), at least for those types of costs "expressly addressed by the NCP," *Von Duprin*, 12 F.4th at 771. Indeed, "the burden rests on the plaintiff to establish that its response costs are consistent with the [NCP]." *Metro. Water Reclamation Dist.*, 473 F.3d at 835 n.16 (citing *Carson Harbor Vill., Ltd. v. County of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006)). But the time for proof is later; at this stage, the Court only assesses whether the complaint "state[s] a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. The Court is therefore unpersuaded by the cases identified by Aqua that describe consistency with the NCP as an element of a section 107(a)(4)(B) cost-recovery claim. All of them address trials or motions for summary judgment involving a developed factual record, except for one, which addressed a motion for class certification. *See* [46] at 12 (citing *G.J. Leasing Co. v. Union Elec. Co.*, 854 F. Supp. 539, 557 (S.D. Ill. 1994); *NutraSweet*, 227 F.3d at 784;

---

Defendant[] … is liable for response costs … that are consistent with the national contingency plan.") (cleaned up); *Brewer v. Ravan*, 680 F. Supp. 1176, 1178–79 (M.D. Tenn. 1988) ("Plaintiffs allege that they have and will in the future incur necessary response costs consistent with the national contingency plan.") (cleaned up).

*Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, No. 1:10-CV-044-JD, 2015 WL 8055999, at *3 (N.D. Ind. Dec. 4, 2015); *Rolan*, 2019 WL 5390557, at *6). The important point is that none of them involve what the Court addresses here: a motion to dismiss a complaint for failure to state a claim under Rule 12(b)(6).

### 5.     Each Plaintiff's Response Costs

Aqua argues that plaintiffs' CERCLA claims should fail because the complaint "fail[s] to plead response costs for each plaintiff." [32-1] at 18. The Court disagrees.

The complaint alleges that "[p]laintiffs … incurred costs in connection with the 'removal' of lead … from the tap water in their homes … . These 'costs of response' include … (1) purchasing bottled water … , (2) purchasing filters … , (3) seeking medical testing … , and (4) testing … the water quality in their homes." The complaint identifies the costs incurred and attributes those costs to plaintiffs. This is enough to "allow[] the court to draw the reasonable inference that [Aqua] is liable for the misconducted alleged," *Iqbal*, 556 U.S. at 678, and to give aqua "fair notice of what the claim is and the grounds upon which it rests." *Orr v. Shicker*, 147 F.4th 734, 741 (7th Cir. 2025) (citing *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)). Aqua cites no binding cases that impose a more demanding pleading standard than this. *See* [32-1] at 18–19 (citing *Andres v. Town of Wheatfield*, No. 1:17-CV-00377, 2020 WL 12904385, at *8 (W.D.N.Y. Mar. 17, 2020); *Cook v. Rockwell Int'l Corp.*, 755 F. Supp. 1468, 1476 (D. Colo. 1991)); [46] at 15 (citing *Lozar v. Birds Eye Foods, Inc.*, 678 F. Supp. 2d 589, 608 (W.D. Mich. 2009)).

### B.    Leave To Amend CERCLA Claim

At bottom, although the Court does not agree with all of Aqua's arguments regarding the sufficiency of plaintiffs' CERCLA claim, it does agree that the complaint's failure to plausibly allege that there has been a release or threatened release of a hazardous substance from a facility into the environment is fatal to that claim. This is a substantial deficiency that gets to the very core of CERCLA's twofold purpose of "promot[ing] the timely cleanup of hazardous waste sites and … ensur[ing] that the costs of such cleanup efforts were borne by those responsible for the contamination." *Von Duprin*, 12 F.4th at 758. That the factual scenario alleged in the complaint fails to align with CERCLA's definitions of "release" and "facility" reflects a fundamental mismatch between that scenario and CERCLA's purpose.

In keeping with that purpose, CERCLA cases typically involve some kind of environmental cleanup. For example, in *Premium Plastics*, 904 F. Supp. 809, the plaintiff had to remove various hazardous substances that had "escap[ed] into subsoil and groundwater," *id.* at 814, possibly from underground gasoline storage tanks and through several large cracks in an old building's concrete floor, *id.* at 810–11. Here, in contrast, plaintiffs allege that they responded with water filters and bottled water to lead that leached into tap water from their homes' interior plumbing. *See* [1] ¶ 200. This is not the type of environmental cleanup that is typical of CERCLA cases. That isn't to say that only scenarios like the one in *Premium Plastics*, 904 F. Supp. 809, can lead to section 107 liability. The point, however, is that factual scenarios that

20

deviate significantly from the typical pattern are less likely to align with the statutory elements and definitions.

Perhaps plaintiffs can amend their complaint with additional factual content that plausibly "show[s] that [they] [are] entitled to relief" under CERCLA section 107. Fed. R. Civ. P. 8(a)(2). But they may only do so if they know or believe, "after an inquiry reasonable under the circumstances," that "the factual contentions have evidentiary support or … will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). Given the five-plus years of litigation involving these facts, defendants, and plaintiffs' counsel, as well as the discovery conducted in previous state-court proceedings, *see* [39] at 8, it is fair to say that plaintiffs have had unusually ample opportunity to investigate the relevant facts. They therefore should know by now whether the evidentiary support exists—or not—for a meritorious CERCLA claim. Indeed, it seems unlikely that, if such provable factual allegations existed, plaintiffs would not have featured them in their complaint already.

But just as speculation is not enough to satisfy a litigant's Rule 11 obligation, neither is it grounds for denying leave to amend a complaint. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519–20 (7th Cir. 2015) ("Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss."). The Court therefore grants plaintiffs leave to amend their CERCLA claim—again, with the understanding that they may file an

21

amended complaint only if they can cure the deficiencies in their CERCLA claim while still complying with their Rule 11 obligations.

## C.    State-Law Claims

Because the Court dismisses plaintiffs' only federal claim for failure to state a claim upon which relief can be granted, Fed. R. Civ. P. 12(b)(6), it declines to exercise subject-matter jurisdiction over plaintiffs' remaining claims. Federal courts only have the power to hear cases over which they have subject-matter jurisdiction. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513–14 (2009). Federal district courts have original subject-matter jurisdiction over civil actions "arising under" the Constitution or laws of the United States, 28 U.S.C. § 1331, or involving more than $75,000 between "citizens of different States," 28 U.S.C. § 1332. *See Arbaugh*, 546 U.S. at 513.

District courts have supplemental jurisdiction over claims that are part of the "same case or controversy" as claims over which they have original jurisdiction, 28 U.S.C. § 1367(a), but they "may decline to exercise supplemental jurisdiction if … the district court has dismissed all claims over which it has original jurisdiction," *id.* at § 1367(c)(3). Then, it is "presum[ed] … that the court will relinquish federal jurisdiction over any supplemental state-law claims." *RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012). Certain circumstances can displace that presumption: (1) the statute of limitations has run on the pendent claim; (2) sending the case to another court will cause a substantial duplication of effort; or (3) it is "absolutely clear" how the remaining claims can be decided. *Id.* at 480. Even so, the presumption "should not be lightly abandoned, as it is based on a legitimate

22

and substantial concern with minimizing federal intrusion into areas of purely state law." *Id.* at 479.

Here, the Court dismisses plaintiffs' CERCLA claim, the only claim over which it has original jurisdiction, [1] ¶¶ 5, 6, so the presumption is that the Court will relinquish supplemental jurisdiction over plaintiffs' other claims. *RWJ Mgmt. Co.*, 672 F.3d at 479. No circumstances rebut that presumption; there is a long history of litigation involving the same facts, defendants, and plaintiffs' counsel, and the remaining claims raise complex issues of preclusion, jurisdiction, and substantive state law, amplifying federal courts' already "substantial concern with minimizing federal intrusion into areas of purely state law," *id.* The remaining claims are therefore dismissed.[4]

## IV.    Conclusion

For the foregoing reasons, Aqua's motion to dismiss [32] is granted, and plaintiffs' motion for leave to file a surreply [48] is denied as moot. The dismissal is without prejudice. Any amended complaint is due on or before January 12, 2026. Failure to file an amended complaint by that date will result in dismissal of the CERCLA claim with prejudice.

---

[4] Because the Court does not delve into the merits of plaintiffs' state-law claims, it denies plaintiffs' motion for leave to file a surreply [48] as moot. The proffered surreply pertained only to the state-law claims. [48-1].

23

_____
Georgia N. Alexakis
United States District Judge

Date: 12/15/25